CNT Investors, LLC, Charles C. Carroll, Tax Matters
Partner, Petitioner v. Commissioner of Internal
Revenue, Respondent

Docket No. 27539–08.        Filed March 23, 2015.

C and his wife and related individuals owned appreciated
real estate through an S corporation (S). C and the related
individuals engaged in a Son-of-BOSS transaction to create
outside basis in a purported partnership to which S contrib-
uted the appreciated real estate. A series of further trans-
actions left C and the related individuals holding the real
estate through the partnership. No party reported recognizing
any of the real estate's built-in gain. For 1999 R determined
that the partnership was a sham and adjusted to zero the
partnership's reported losses, deductions, distributions, capital
contributions, and outside basis. R also determined a penalty
under I.R.C. sec. 6662 on multiple grounds. In this TEFRA
partnership-level proceeding, C, as TMP, conceded that the
partnership and the Son-of-BOSS transaction were shams

having no business purpose but challenged the FPAA's timeliness and the penalty. *Held*: The step transaction doctrine applies to the transactions at issue. Collapsing the steps, S distributed the appreciated real estate to its shareholders and should have recognized gain under I.R.C. sec. 311(b). The parties' stipulation that the partnership and the Son-of-BOSS transaction were shams does not compel us to disregard the real estate's transfer or the gain it generated because this transfer was the object and end result, not a mere component, of the subject series of transactions. *Held*, *further*, under *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 540–543 (2000), for each partner in a TEFRA partnership, the limitations period for the assessment of tax attributable to partnership items or affected items is the longer of the period specified in I.R.C. sec. 6229 or that prescribed by I.R.C. sec. 6501. C and the related individuals entirely omitted from their respective tax returns passthrough I.R.C. sec. 311(b) gain. Consequently, R contends the six-year limitations period of I.R.C. sec. 6501(e)(1)(A) applies. Under *United States v. Home Concrete Supply, LLC*, 566 U.S. ____, 132 S. Ct. 1836 (2012), for purposes of determining whether I.R.C. sec. 6501(e)(1)(A) applies to any taxpayer, we must disregard any omitted gain that is attributable solely to the basis overstatement resulting from the Son-of-BOSS transaction. *Held*, *further*, for each partner, a portion of the omitted gain was not attributable to the basis overstatement. With respect to C and his wife (W), that portion constitutes a substantial omission from income under I.R.C. sec. 6501(e)(1)(A). With respect to the other partners, it does not. Therefore, the FPAA was timely issued with respect to C and W only, and C and W, but not the other individual partners, are proper parties to the action under I.R.C. sec. 6226(d)(1)(B). *Held*, *further*, the adjustments in the FPAA are sustained. *Held*, *further*, no I.R.C. sec. 6662 penalty applies because C, as the partnership's TMP, relied reasonably and in good faith on independent professional advice.

*Steven R. Mather* and *Lydia B. Turanchik*, for petitioner. *John W. Stevens* and *Richard J. Hassebrock*, for respondent.

## CONTENTS

FINDINGS OF FACT ............................................................................ 164

I.    Introducing the Carroll Family ...................................................... 165
II.   Solving the Low Basis Dilemma ................................................... 168
III.  Selling the Son-of-BOSS Strategy .............................................. 171
IV.   Achieving the Basis Boost ........................................................... 173

      A.  Son-of-BOSS ........................................................................ 174
      B.  Basis Boost ......................................................................... 176
      C.  Real Estate Extraction ...................................................... 177
V.    Reporting the Transactions ....................................................... 179
      A.  CNT's 1999 Returns .......................................................... 179
      B.  CCFH's 1999 Return ......................................................... 180
      C.  Individuals' 1999 Returns ................................................. 181
VI.   Challenging the Transactions ................................................... 181

OPINION ............................................................................................ 182

I.    Preliminary Matters ................................................................. 182
      A.  When Appellate Venue Matters ....................................... 182
      B.  Why Appellate Venue Does Not Matter Here ...................... 183
II.   Timeliness of the FPAA ............................................................ 186
      A.  Timeliness Under TEFRA .................................................. 186
      B.  Theory of Omission ........................................................... 188
      C.  Omission by Bootstrapping ................................................ 188
      D.  Scope of Sham ................................................................... 191
          1.  *Gregory* Revisited .............................................. 194
          2.  Sham Transaction Doctrine ........................................ 199
          3.  Step Transaction Doctrine .......................................... 202
          4.  Blending the Doctrines ................................................ 204
          5.  Conclusion .................................................................. 208
      E.  Definition of Omission ....................................................... 208
          1.  Mr. Carroll ................................................................. 210
          2.  Ms. Cadman ............................................................... 211
          3.  Ms. Craig .................................................................... 212
      F.  Adequacy of Disclosure ..................................................... 213
          1.  Legal Standard .......................................................... 213
          2.  Petitioner's Proof ....................................................... 215
          3.  Returns' Revelations .................................................. 215
      G.  Conclusion ......................................................................... 219
III.  Consequences of the Sham Stipulation ...................................... 219
IV.  Liability for the Accuracy-Related Penalty ................................ 220
      A.  Penalties' Applicability ...................................................... 221
      B.  Petitioner's Defense .......................................................... 222
          1.  Sufficient Expertise? ................................................. 223
          2.  Necessary Information? .............................................. 227
          3.  Good-Faith Reliance? ................................................ 229
V.    Conclusion ................................................................................ 234

WHERRY, *Judge*: This case constitutes a partnership-level proceeding under the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97–248, sec. 402(a), 96 Stat.

at 648 (codified as amended at sections 6221–6234).[1] On August 25, 2008, respondent mailed a notice of final partnership administrative adjustment (FPAA) to CNT Investors, LLC (CNT), for its taxable period ending December 1, 1999. Pursuant to section 6226, petitioner, Charles C. Carroll, CNT's tax matters partner (hereinafter referred to as Mr. Carroll or petitioner), timely petitioned this Court on November 12, 2008, for readjustment of CNT's partnership items determined in the FPAA. After concessions by petitioner, which we discuss below, the issues remaining for decision are:

(1) whether the six-year limitations period of section 6501(e)(1)(A) applies to CNT's partners for their 1999 taxable years, such that the FPAA was timely;

(2) whether the adjustments in the FPAA should be sustained; and

(3) whether a section 6662 valuation misstatement or accuracy-related penalty applies to any underpayment attributable to the partnership-level determinations made in the FPAA, to the extent sustained herein.

## FINDINGS OF FACT

Petitioner lived in California when he filed CNT's petition. CNT, the limited liability company to which the FPAA was directed, was, as agreed to by the parties, a sham entity with no business purpose. CNT did, however, file Federal income tax returns annually from 1999 through at least 2010. On its 1999, 2000, and 2001 returns CNT provided a California address and reported ownership of real property. As of January 22, 2015, online grantor/grantee records of the Ventura County, California, Recorder reflected that CNT held legal title to interests in four parcels of real property situated within that county.[2] Those records also reflected that CNT

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986, as amended and in effect for the year at issue, 1999, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] A court may take judicial notice of appropriate adjudicative facts at any stage in a proceeding whether or not the parties request it. *See* Fed. R. Evid. 201(c), (f). In general, the court may take notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. *Id.* subdiv. (b).

leased some portion of its real property interests to "SCI California Funeral Services, Inc.", in 2004. The lease agreement(s) had a 15-year term and included an option to purchase.

## I. *Introducing the Carroll Family*

After serving in the United States Marine Corps at the time of World War II, Mr. Carroll attended mortuary science college. He also became a licensed embalmer. Mr. Carroll began operating Charles Carroll Funeral Home (funeral home) in 1954. The funeral home was an archetypal family business. Mr. Carroll and his wife, Garnet, lived for many years and raised their twin daughters, Teri Craig and Nancy Cadman, at various times in homes above, behind, and next door to their mortuaries.[3] Mr. and Mrs. Carroll both worked

---

As we do here, a court may take judicial notice of public records not subject to reasonable dispute, such as county real property title records. *See, e.g.*, *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1057–1058 (C.D. Cal. 2008) (taking judicial notice of two deeds of trust and a full reconveyance recorded in the Official Records of the Los Angeles County, California, Recorder); *Haye v. United States*, 461 F. Supp. 1168, 1174 (C.D. Cal. 1978) (taking judicial notice of deeds recorded with the Los Angeles County Index). Ample precedent exists for our reliance on electronic versions of public records. *See, e.g.*, *Marshek v. Eichenlaub*, 266 Fed. Appx. 392, 392–393 (6th Cir. 2008) (holding that court could take judicial notice of information on the Inmate Locator, which enables the public to track the location of Federal inmates, is maintained by the Federal Bureau of Prisons, and is accessed through the agency's Web site, to discover that appellant had been released since the filing of his appeal and conclude that there remained no actual injury which the court could redress with a favorable decision and, thus, dismiss the appeal as moot); *Denius v. Dunlap*, 330 F.3d 919, 926–927 (7th Cir. 2003) (holding that District Court erred when it refused to take judicial notice of information on official Web site of Federal agency that maintained medical records on retired military personnel, the fact of which was appropriate for judicial notice because it is not subject to reasonable dispute); *Sears v. Magnolia Plumbing, Inc.*, 778 F. Supp. 2d 80, 84 n.6 (D.D.C. 2011) (taking judicial notice of corporate resolutions available through the Maryland Department of Assessments and Taxation's Web site); *Lengerich v. Columbia Coll.*, 633 F. Supp. 2d 599, 607 n.2 (N.D. Ill. 2009) (taking judicial notice of a corporation filing for Columbia College Chicago on the Illinois secretary of state's Web site).

[3] We refer to Mr. and Mrs. Carroll, Ms. Craig, and Ms. Cadman collectively as the Carroll family, and to Mr. Carroll, Ms. Craig, and Ms. Cadman (i.e., the Carroll family, less Mrs. Carroll) collectively as the Carrolls.

for the funeral home from 1954 until the business was sold in 2004, and their daughters and Ms. Craig's two sons also worked for the funeral home during various periods.

Although Mr. Carroll was an astute and successful businessman, he understood only basic tax principles and lacked sophistication in various stock and bond type financial matters. Hence he sought counsel and assistance from professional advisers on legal and accounting issues relating to the funeral home. Attorney J. Roger Myers began working with Mr. Carroll in the late 1970s or early 1980s, when he assisted Mr. Carroll in acquiring two additional mortuaries. Mr. Myers thereafter became the funeral home's de facto general counsel, providing general business consultation, maintaining records, and advising on employment and regulatory issues. The Carroll family regularly consulted Mr. Myers on legal issues arising in connection with the funeral home, and Mr. and Mrs. Carroll also engaged Mr. Myers to prepare their estate plan, which included an inter vivos giving program.

As of 1999 Mr. Myers had practiced law for almost 30 years, most of them spent in a business-oriented private practice involving some civil litigation. Although he did not hold himself out as a tax lawyer and typically referred clients to specialists for complicated income tax advice, Mr. Myers had taken basic Federal income and estate tax courses in law school, had previously prepared estate tax returns, and had advised Mr. Carroll on general tax law principles.

Certified Public Accountant (C.P.A.) Frank Crowley also began working with Mr. Carroll in the early 1980s, and Mr. Carroll followed him when Mr. Crowley changed accounting firms. Mr. Crowley provided general bookkeeping and monthly payroll services for the funeral home, and he prepared its financial statements and Federal income tax returns. In the late 1990s Mr. Crowley conferred with Mr. Carroll monthly concerning the funeral home's financial statements. He interacted more frequently with Ms. Cadman and Ms. Craig, who performed in-house bookkeeping duties for the funeral home. Mr. Carroll relied on Mr. Crowley for routine income tax advice although the funeral home's operations rarely gave rise to complex tax issues.

In addition to his C.P.A. credential, Mr. Crowley held bachelor's and master's degrees in accounting and was a cer-

tified financial planner. He had taken classes in individual and corporate income tax and partnership and estate tax during his degree programs. Before meeting Mr. Carroll, Mr. Crowley had worked as a cost accountant at a publicly held company and practiced at multiple private accounting firms. His work entailed advising clients on accounting and income and estate tax issues, and as of 1999, financial matters.

By the mid-1990s, the funeral home's operations had expanded to five mortuaries. The Carrolls owned the funeral home through a corporation, Charles Carroll Funeral Home, Inc. (CCFH), which also held title directly or indirectly to the mortuary buildings and underlying real property.[4] Mr. Carroll was the funeral home's original owner and CCFH's only shareholder until he implemented the giving program through which he transferred annual tranches of shares to his daughters.[5] As of 1999 Mr. Carroll held 94.4512% of

---

[4] Some evidence in the record suggests that, before November 1999, Mr. and Mrs. Carroll held legal title to one of the five real properties as trustees of the Carroll Family Trust. The record also suggests, however, that for all practical purposes, the Carroll family treated this fifth property as if it, too, were owned by CCFH. Ms. Cadman testified that CCFH owned all five properties. Ms. Craig initially confirmed her sister's statement. After prompting from counsel, however, she stated that she did recall something but was not an expert, then agreed when counsel asked her to confirm her recollection that one property was owned by a trust. She emphasized that, operationally, the distinction did not matter. Mr. Crowley, who had for many years prepared the Carroll family's individual tax returns and those for CCFH and who also assisted Ms. Craig with bookkeeping for the business, apparently believed that CCFH owned all five properties. In a facsimile message sent in August 1999 to the promoter of the tax shelter that led to this case, Mr. Crowley listed all five properties as assets of the corporation, breaking out the book values of the land and buildings on each parcel. When asked by respondent's counsel whether the promoter needed this information in order to calculate the amount of gain that the shelter transaction would need to offset, Mr. Crowley answered that he believed so. We found Mr. Crowley credible as a witness and conclude that he would not have sent the promoter information inconsistent with the Carroll family's and CCFH's past tax reporting. Accordingly, we find that, for tax purposes, CCFH owned all five properties, even if one was titled in what amounted to a nominee's name.

[5] Some evidence in the record suggests that Mr. and Mrs. Carroll originally held CCFH's shares through a form of joint ownership, and that Mr. and Mrs. Carroll jointly held a partnership interest in CNT. Other evidence is to the contrary. In their supplemental stipulation of fact the par-

Continued

CCFH's outstanding shares, and Ms. Cadman and Ms. Craig each held 2.7744%. CCFH had initially operated as a C corporation but elected S corporation status at some time before 1999.

## II. *Solving the Low Basis Dilemma*

Mr. Carroll was 73, going on 74, in early 1999. He and his family had begun to contemplate his retirement and the funeral home's sale. Mr. Carroll intended to sell the funeral home business but retain ownership of the real property, which would be leased to the buyer(s). SCI, a mortuary company that had recently begun operating in the area, had followed this model for acquisitions of other local mortuaries, and SCI had contacted the Carrolls about purchasing the funeral home.

Mr. Carroll believed that, if a national mortuary chain purchased the funeral home, it would not want to purchase the real property. Retaining and leasing the real estate would also provide the family with a periodic income stream during retirement. Mr. Carroll was financially conservative, and he had no extensive investment experience. Before 1999 he had never invested in United States Treasury notes (T-notes), traded stocks, bonds, or other securities on margin, or participated in a short sale transaction. In 1999 Mr. Carroll's interests in the funeral home and five mortuary properties represented almost 100% of his net worth, and his only other holdings consisted of certificates of deposit and cash.

To facilitate sale of the business without the real estate, Messrs. Myers and Crowley determined that the two needed to be separated. They initially concluded that the preferred mechanism for achieving this separation would be for CCFH to divest itself of the mortuary properties, leaving it holding only the funeral home's business operations. They could not, however, identify a way of transferring the real estate out of CCFH without triggering recognition of substantial built-in gain, caused largely by inflation in real estate prices.[6] As of

ties have simplified matters matters by referring to Mr. Carroll as holding his interests in CCFH and CNT and as participating in the transactions at issue independently from his wife. We follow the parties' lead and refer herein only to Mr. Carroll given that, in any event, Mr. and Mrs. Carroll filed joint Federal income tax returns for 1999 and 2000.

[6] Depending on when CCFH filed its S election, some or all of the recog-

November 1999, in the aggregate CCFH's real estate holdings had an adjusted tax basis of $523,377 and a fair market value of $4,020,000.

By late 1999 Mr. Crowley considered the real estate's proposed transfer from CCFH a "dead issue" because, after a few years of analysis and brainstorming with Mr. Myers and other attorneys, he had identified no way for the Carrolls to accomplish the transfer without incurring significant tax liability. Nevertheless, while sale of CCFH's stock (after divestiture of the real estate) appeared a nonstarter, sale of its business assets remained a possibility. In that case, however, CCFH could lose its S election and become subject to dual-level income taxation within three years after the asset sale because of the passive income limitation of section 1362(d)(3). Either way, retention of the real estate would have income tax implications.

In 1999 Mr. Myers encountered a potential solution. Over lunch with a longtime acquaintance, local financial adviser Ross Hoffman, Mr. Myers described Mr. Carroll's problem in general terms, explaining that he had a client who needed to transfer appreciated assets out of a corporation for estate planning purposes. Mr. Hoffman advised Mr. Myers that he knew of a strategy that might work.

Earlier in the year Mr. Hoffman had attended a Las Vegas conference sponsored by Fortress Financial, a New York-based tax planning firm. Erwin Mayer, an attorney with the law firm Jenkens & Gilchrist, gave a seminar at the conference on a strategy he called a "basis boost" that could allegedly increase the tax basis of low-basis assets. The basis boost strategy Mr. Mayer presented was, in substance, a Son-of-BOSS transaction.[7]

---

nized gain could have been subject to two levels of income tax because of sec. 1374(a).

[7] Throughout this Opinion, for brevity and ease of reference, we characterize the T-note short sales and purported partnership capital contributions made by Mr. Carroll and his daughters as a Son-of-BOSS transaction. We recognize, however, that the overall series of transactions did not entirely align with the definition we have previously provided for a Son-of-BOSS transaction:

Son-of-BOSS is a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy." There are

Continued

Mr. Hoffman was not a tax professional and did not hold himself out as one. In 1999 he was a certified financial planner and regularly advised clients on liquidity, life insurance, asset allocation, and investment planning, with a focus on estate planning. He offered clients "industry designed" tax-advantaged products, such as limited partnerships, municipal bonds, and annuities. Mr. Hoffman attended the Las Vegas conference to learn about strategies and ideas that he could sell to clients or to their attorneys or C.P.A.'s. Before attending the conference, Mr. Hoffman was unfamiliar with Mr. Mayer and with Jenkens & Gilchrist and had never traded stocks or conducted any T-note or short sale transactions for clients. Mr. Hoffman never fully understood the Son-of-BOSS transaction that Mr. Mayer pitched at the conference, but he nevertheless described it to Mr. Myers at the luncheon as a possible solution for Mr. Myers' client.

Mr. Myers wanted to understand the Son-of-BOSS transaction better before presenting it to Mr. Carroll, so Messrs. Hoffman and Myers met again, this time for a conference call with Mr. Mayer. Bill Fairfield, another Ventura, California, attorney who had clients situated similarly to the Carrolls, also participated in the call. After speaking with Mr. Mayer, Mr. Myers understood that the proposed transaction would involve a short sale and would conclude with the real estate's being transferred out of CCFH with a new basis. At Mr.

a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis. If so, the result is that the partners will have a basis in the partnership so great as to provide for large—but not out-of-pocket—losses on their individual tax returns. Enormous losses are attractive to a select group of taxpayers—those with enormous gains. [*Kligfeld Holdings v. Commissioner*, 128 T.C. 192, 194 (2007).]

Here, as explained below, rather than use the Son-of-BOSS to offset unrelated, recognized gains, the Carrolls used the Son-of-BOSS to eliminate gain prospectively. We note that in *Kligfeld Holdings*, the taxpayer likewise executed the Son-of-BOSS transaction to boost the tax basis of an appreciated asset (in Mr. Kligfeld's case, stock) to forestall gain recognition upon its disposition. *See id.* at 194–197.

Myers' request, Mr. Mayer sent him a memorandum prepared by Jenkens & Gilchrist describing and analyzing the transaction. Mr. Myers reviewed the memorandum and consulted some of the legal authorities cited therein, albeit not in extreme detail.

Thereafter, on two occasions Messrs. Myers and Hoffman met with the Carrolls and Mr. Crowley at Mr. Myers' office to discuss the proposed transaction. Using visual aids, Mr. Hoffman described in broad strokes how Mr. Carroll could, through a short sale of securities, create basis in a new entity, and he mentioned that Ted Turner had engaged in a similar transaction and, in a subsequent case concerning it, prevailed. Ms. Cadman found the Ted Turner story persuasive, reasoning that, if someone who could afford the very best legal and tax advice had engaged in this kind of transaction, it must be effective.[8] After the second meeting with Mr. Hoffman, the Carrolls decided to proceed with the Son-of-BOSS transaction.

## III. *Selling the Son-of-BOSS Strategy*

Mr. Hoffman pitched the Son-of-BOSS transaction to the Carrolls, but the Carrolls never became his clients or paid him any compensation. He never provided any tax advice to Mr. Carroll, gave a written opinion as to the transaction, or expressly represented that the transaction would achieve Mr. Carroll's desired result. He did, however, answer Mr. Carroll's and his advisers' questions, parroting what he had heard from Mr. Mayer and consulting with Mr. Mayer when he needed more information. Messrs. Myers and Crowley and Ms. Cadman all perceived, after meeting with him, that Mr. Hoffman supported and recommended the transaction. Once Mr. Carroll decided to go forward with the transaction, Mr. Hoffman assisted ministerially with finalizing paperwork. He expected to receive a "finder's fee" in the form of a percent-

[8] By agreement between the parties' counsel, and despite respondent's subpoenas, which respondent did not seek to enforce, neither Mr. nor Mrs. Carroll testified at trial, in both cases for health reasons. Petitioner's counsel represented, and letters from Mr. and Mrs. Carroll's attending physician lodged with the Court confirm, that neither Mr. Carroll nor Mrs. Carroll would be able to testify to any meaningful recollection of the relevant events.

age of Fortress Financial's fee if Mr. Carroll proceeded with the transaction.

After the various presentations, meetings, and phone calls, Mr. Myers believed that he had a good grasp of how the Son-of-BOSS transaction would work and of the legal theories behind it. He had met with fellow Ventura attorney Bill Fairfield and had researched Jenkens & Gilchrist in Martindale Hubbell and on the Internet, learning that the firm had offices throughout the United States, including in Chicago, where Mr. Mayer worked. He had spoken by telephone with Mr. Mayer about the transaction. He had reviewed Mr. Mayer's memorandum and the supporting legal authorities. And he had been present for Mr. Hoffman's presentation. Mr. Myers believed the transaction was feasible and that the Carrolls should seriously consider it. He advised Mr. Carroll that the transaction looked like a viable way to resolve CCFH's low basis dilemma.

Mr. Myers' opinion did not change as the transaction proceeded. During the implementation phase, he spoke by telephone with Mr. Mayer on multiple occasions. Mr. Myers did not know all of the details of the transaction. He did not know, for instance, how much money was actually at risk in the Son-of-BOSS component of the transaction, had no financial information about the short sale, and was unaware that the short sale would almost certainly generate no profit. He did not know how much Jenkens & Gilchrist would charge Mr. Carroll to implement the transaction. On the basis of what he did know, however, Mr. Myers formed the opinion that the transaction was legitimate and proper, and he shared this opinion with Mr. Carroll. Mr. Myers was working only for Mr. Carroll, billed Mr. Carroll monthly for work on the transaction at his regular hourly rate, and received no other compensation or incentive for recommending it.

Like Mr. Myers, Mr. Crowley did not know how much money was actually at risk in the Son-of-BOSS transaction, had no financial information about the short sale, and was unaware that the short sale would almost certainly generate no profit. Also like Mr. Myers, Mr. Crowley was working only for Mr. Carroll and received no unusual compensation for his counsel to the Carroll family. However, his advice was more ambivalent than Mr. Myers': Mr. Crowley did not conceal his lack of complete understanding of the transaction, and rather

than affirmatively endorse it, he told Mr. Carroll that he would "go along with" it. He was willing to do so because the transaction had been developed by what he thought was a knowledgeable national law firm that was sufficiently confident to promise, in writing, that it would defend the transaction if it were challenged. As a C.P.A. in a small, two-partner firm, Mr. Crowley felt intimidated by the Jenkens & Gilchrist brand and essentially "acquiesced". Notwithstanding Mr. Crowley's uncertainty, Ms. Cadman testified that the family believed he and their other advisers recommended proceeding with the Son-of-BOSS transaction. According to Ms. Cadman, had Mr. Crowley advised against it, the Carrolls would not have moved forward.

## IV. *Achieving the Basis Boost*

Once the "go" decision had been made, Mr. Mayer formed four limited liability companies (LLCs): (1) CNT, which elected to be treated as a partnership for income tax purposes,[9] (2) Teloma Investments, LLC (Teloma), of which Mr. Carroll was the sole member, (3) Santa Paula Investments, LLC (Santa Paula), of which Ms. Craig was the sole member, and (4) S. Mountain Investments, LLC (S. Mountain), of which Ms. Cadman was the sole member.[10] Each of the LLCs was formed under Delaware law.[11] Each was a sham entity with no business purpose.

---

[9] The parties have stipulated that CNT was a sham entity with no business purpose. Respondent further contends that CNT was not a partnership as a matter of fact, and that its partners should not be treated as such. We use the terms "partnership" and "partner" and related terms for convenience only.

[10] Teloma, Santa Paula, and S. Mountain would ordinarily be disregarded as entities separate from their respective sole owners. *See* secs. 301.7701–2(c)(2), 301.7701–3(a), (b)(1)(ii), Proced. & Admin. Regs. None of these three entities ever filed a Federal income tax return, and CNT identified the entities' individual owners, not the entities themselves, as partners even though the individuals made their capital contributions through their respective LLCs.

[11] Online records of the Delaware Division of Corporations reflect that CNT Investors, LLC, was formed in Delaware on August 26, 1999. Those records do not reflect whether CNT remains in good standing, but it evidently has not been dissolved. Online records of the California secretary of state reflect that a "CNT Investors, LLC" was formed in California on June 26, 2009. Those records list Ms. Cadman as that entity's agent for

Continued

Pursuant to directions from and with the active control of Mr. Mayer and his colleagues at Jenkens & Gilchrist, the following sequence of transactions occurred. [12]

A. *Son-of-BOSS*

On November 18, 1999, the five real properties were transferred by deed to CNT. The book value of the transferred real estate was credited to CCFH's capital account. *See supra* note 4. At that time, the five properties' aggregate adjusted tax basis, and hence CCFH's initial outside basis in CNT, was $523,377. [13]

On November 24, 1999, Mr. Carroll, Ms. Craig, and Ms. Cadman, via their respective LLCs, engaged in short sales of T-notes. [14] Once the proceeds had settled, on November 26,

---

service of process and list the entity's address as that provided on CNT's 1999, 2000, and 2001 Federal income tax returns. We take judicial notice of these adjudicative facts pursuant to Fed. R. Evid. 201(b). *See Sears*, 778 F. Supp. 2d at 84 n.6 (taking judicial notice of corporate resolutions available through the Maryland Department of Assessments and Taxation's Web site); *Grant v. Aurora Loan Servs., Inc.*, 736 F. Supp. 2d 1257, 1265 (C.D. Cal. 2010) (taking judicial notice of, inter alia, Delaware secretary of state's certificate of authentication for a certificate of incorporation and a certificate of conversion from a corporation to an LLC); *Lengerich*, 633 F. Supp. 2d at 607 n.2 (taking judicial notice of a corporation filing for Columbia College Chicago on the Illinois secretary of state's Web site); *supra* note 2.

[12] We explain the intended tax consequences of each transaction merely to illustrate how the shelter was designed to work. We expressly do not find that any of these consequences actually ensued.

[13] Under sec. 722, "[t]he basis of an interest in a partnership acquired by a contribution of property * * * to the partnership shall be the * * * adjusted basis of such property to the contributing partner at the time of the contribution"—that is, an exchanged basis. Hence, as no taxable gain was recognized at that time, CCFH's tax basis in its partnership interest would equal its tax basis in the contributed real estate. The Schedule K–1, Partner's Share of Income, Credits, Deductions, etc., CNT issued to CCFH for CNT's tax year ending December 1, 1999, reports the amount of CCFH's capital contributions during the tax year as $523,377.

[14] In a short sale, the investor borrows securities and incurs an obligation to return identical securities within a specified period. The investor then sells the borrowed securities for cash, planning to purchase replacement securities later for return to the lender. If the securities' market price declines in the meantime, the investor will make a profit. If the securities' market price increases, the investor will incur a loss. When an investor conducts such a transaction through a broker, the broker may require that the investor post the sale proceeds as security and/or deposit

1999, the Carrolls transferred a total of $2,877,343 in cash proceeds from the short sales, together with the related obligations and a nominal amount of cash, apparently $10,800, to CNT. These transfers were sham transactions having no business purpose. The transferred proceeds and cash, totaling $2,877,343, were credited to Mr. Carroll, Ms. Cadman, and Ms. Craig's capital accounts and established their respective initial outside bases in CNT as $2,716,609, $80,367, and $80,367. *See supra* note 13. On the premise that the transferred obligations were not liabilities for purposes of determining the purported partners' capital contributions, their capital accounts and outside bases were not reduced to reflect the partnership's assumption of these partner obligations. [15]

CNT immediately used the transferred proceeds and cash to purchase T-notes having a principal amount slightly greater than the amount the Carrolls had sold short. It did so under an agreement with Deutsche Bank whereby Deutsche Bank agreed to repurchase the T-notes (repo). Through this offsetting repo transaction, CNT reduced to near zero its risk of incurring a loss on the short sale.

On November 29, 1999, CNT closed the repo transaction and used the proceeds to satisfy the obligations that had

funds into a "margin account" so that, if the market price has increased and the short sale proceeds are insufficient to fund the purchase of replacement securities, the broker can apply the funds in the margin account to the deficit. *See generally Farr v. Commissioner*, 33 B.T.A. 557, 559 (1935) (explaining a short sale conducted on the New York Stock Exchange through a broker).

In opening the short sale transaction and in later contributing the open positions and obligations to CNT, the Carrolls acted through their respective wholly owned LLCs. Because we disregard these three LLCs as entities separate from their owners, *see supra* note 10, and for brevity, we refer to the individuals directly.

[15] Under sec. 752(b), "[a]ny decrease in a partner's * * * individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership." The partner's outside basis decreases by the amount of the deemed distribution. Sec. 733(1). The partner's capital account also decreases by the amount of the deemed distribution. Sec. 1.704–1(b)(2)(iv)(*b*)(*4*), Income Tax Regs. Of course, if a partnership were to assume a partner's obligation that did not qualify as a "liability" for purposes of sec. 752, as was intended here, then the downward adjustments of outside basis and capital would not occur.

been transferred to it, repurchasing the same number of T-notes that Mr. Carroll, Ms. Craig, and Ms. Cadman had previously sold short and closing the short sale positions. This transaction, which generated a nominal $2,268 loss to CNT, had an estimated less than 1% probability of generating a gain or loss greater than the additional $10,800 margin that Deutsche Bank had required the Carrolls to post in connection with the transaction. The transaction did, however, leave CNT allegedly holding only the real estate with an adjusted tax basis, or inside basis, of $523,377.[16] By comparison, its partners' aggregate adjusted basis in their partnership interests, or outside basis, was $3,400,718.

B. *Basis Boost*

On December 1, 1999, Mr. Carroll, Ms. Cadman, and Ms. Craig, who were CCFH's only shareholders, purported to transfer their respective partnership interests in CNT to CCFH. As a result of these transfers, CCFH became CNT's sole owner.

The transfers triggered the termination of CNT as a partnership.[17] For tax purposes, the following events were deemed to occur: CNT liquidated, transferring all of its assets to its partners in proportion to their interests, and the three individual partners then contributed the assets received in the liquidation to CCFH, leaving CCFH holding all of the real estate.[18] Each of CNT's partners took a tax basis in the assets received in the deemed liquidation equal to that partner's outside basis.[19] With that step, the real

---

[16] Under sec. 723, a partnership's basis in contributed property is "the adjusted basis of such property to the contributing partner at the time of the contribution"—that is, a transferred basis—so CNT would have taken CCFH's tax basis in the real estate since neither one recognized any gain that could have added to that basis.

[17] Sec. 708(b)(1)(B) provides that a partnership is considered terminated if "within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits." Here, 84.6% of CNT changed hands.

[18] *See* Rev. Rul. 99–6, 1999–1 C.B. 432.

[19] Under sec. 732(b), "[t]he basis of property * * * distributed by a partnership to a partner in liquidation of the partner's interest shall be an amount equal to the adjusted basis of such partner's interest in the partnership". Here, the partners' initial aggregate outside basis, $3,400,718, would have been reduced pursuant to sec. 705(a)(2) for the $2,268 short-

estate's aggregate adjusted tax basis rose from $523,377 to $3,396,716, ostensibly without any taxable event's having occurred.

Upon the deemed contribution of CNT's assets to CCFH, the real estate's newly boosted basis transferred to CCFH, and the Carrolls' aggregate basis in their CCFH stock increased by the same amount.[20] Inside and outside bases were once again allegedly aligned. All that remained to be done was to transfer the real estate out of CCFH.

C. *Real Estate Extraction*

On December 31, 1999, CCFH distributed percentage interests in CNT (totaling 100%) to its three shareholders in proportion to their respective interests in CCFH. The deemed liquidation and contribution occurring on December 1 resulted in ownership of the real estate's shifting, for tax purposes, from CNT to the Carrolls, and then from them to CCFH. But title to the real estate did not change; CNT continued to hold title to the property. For tax purposes, the distribution of CNT interests on December 31 resulted in (1) a deemed distribution of the real estate to CCFH's shareholders, followed by (2) their deemed contribution of the real estate to a new partnership, New CNT.[21]

Upon the deemed distribution of the real estate, CCFH recognized gain equal to the difference between its aggregate adjusted tax basis in the real estate, $3,396,716, and the real estate's then-current fair market value, $4,020,000—that is,

term capital loss and $1,734 of interest expense incurred by CNT in connection with the short sale.

[20] Under sec. 351(a), persons transferring property to a corporation recognize no gain or loss if the transfer is made "solely in exchange for stock in such corporation and immediately after the exchange" such persons hold stock representing 80% of the corporation's combined voting power and 80% of the other shares of the corporation. In this case, the Carrolls held 100% of CCFH's outstanding shares both before and after the transaction and so would have recognized neither gain nor loss. Their basis in their CCFH stock would have increased pursuant to sec. 358(a) by the amount of their basis in their partnership interests adjusted pursuant to sec. 705(a)(2), *see supra* note 19, or $2,873,955. Under sec. 362(a), CCFH would have taken a transferred basis of $2,873,955 in the 84.6% of CNT that it received in the exchange, giving it a total basis in CNT of $3,396,716.

[21] *See* Rev. Rul. 99–5, 1999–1 C.B. 434.

$623,284. [22] Because CCFH was an S corporation, that $623,284 gain passed through and was taxable to CCFH's shareholders. [23] The passthrough gain increased each shareholder's outside basis in CCFH, possibly giving each a sufficient basis to absorb the distribution without further gain recognition. [24] The shareholders' aggregate basis in the distributed real estate, and the amount of the distribution, was its fair market value, $4,020,000. [25] That fair market value basis transferred to New CNT upon the deemed contribution. [26] The deemed contribution also revived CNT as a partnership in the form of New CNT.

This series of transactions divested CCFH of its real estate holdings and concluded with Mr. Carroll, Ms. Cadman, and Ms. Craig owning the five mortuary properties through New CNT, purportedly generating only $623,284 of taxable, long-term capital gain in the process. Absent the basis boost to the real estate from the Son-of-BOSS transaction, the amount would have been $3,496,623. [27] Jenkens & Gilchrist

---

[22] Sec. 311(b) provides, generally, that if a corporation distributes to a shareholder property, the fair market value of which exceeds its adjusted tax basis, the corporation must recognize gain "as if such property were sold to the distributee at its fair market value."

[23] Under sec. 1366(a)(1) and (c), an S corporation shareholder's gross income for any tax year includes the shareholder's pro rata share of the S corporation's "items of income" for the S corporation's tax year ending with or within the shareholder's tax year.

[24] Sec. 1367(a)(1) provides that an S corporation shareholder's basis in his stock shall be increased by the sum of income items of the S corporation passed through to the shareholder under sec. 1366(a)(1). Under sec. 1368(b) and (c), a distribution to an S corporation shareholder is nontaxable to the extent of either the shareholder's basis (if the S corporation has no earnings and profits), or the net amount of passthrough income and loss from the S corporation reported by the shareholder, less prior distributions (if the S corporation has earnings and profits).

[25] Under sec. 301(b), the amount of a distribution is its fair market value. Under sec. 301(d), a corporate shareholder takes a fair market value basis in property distributed by a corporation.

[26] Under sec. 723, a partnership takes a transferred basis in property contributed by a partner in exchange for a partnership interest.

[27] Because sec. 311(b) requires a corporation to recognize gain on the distribution of appreciated property as if it had sold that property for fair market value, we calculate gain absent the basis boost as the difference between CCFH's amount realized, the property's fair market value of $4,020,000, and CCFH's original tax basis, $523,377. Respondent agrees with these figures for the real estate's fair market value and adjusted tax

charged $116,000 for its services in arranging, executing, and assisting with reporting of the series of transactions. The firm also delivered to Mr. Carroll, Ms. Cadman, and Ms. Craig similar opinion letters describing the transactions and attesting to their probable tax consequences.

## V. *Reporting the Transactions*

Mr. Crowley prepared all relevant Federal income tax returns for the transactions. When asked to prepare returns for tax year 1999, Mr. Crowley sought further explanation about the transactions from Mr. Mayer. Jenkens & Gilchrist later reviewed Mr. Crowley's first drafts of CCFH and CNT's 1999 tax returns at his request and recommended some changes.

### A. *CNT's 1999 Returns*

Because of its mid-year termination and subsequent revival, CNT filed two Forms 1065, U.S. Partnership Return of Income, for tax year 1999: one for the taxable period September 15 through December 1, 1999 (December 1 return), and one for a one-day taxable period, December 31, 1999 (December 31 return).

On the December 1 return, CNT reported interest expense of $1,734 and, on Schedule D, Capital Gains and Losses, a $2,268 short-term capital loss incurred on November 29, 1999, on a short sale of T-notes. On the appended Schedules K–1 CNT reported capital interests, capital contributions, distributive shares of short-term capital loss and interest expense, distributions, and yearend capital accounts as follows:

---

basis but calculates the amount of gain that would have been recognized by CCFH (and passed through to its shareholders) absent the Son-of-BOSS transaction as $3,497,239. Respondent does not explain why his computation exceeds the difference between basis and the amount realized by $616, but this amount does equal CCFH's distributive share of CNT's net loss reported on its December 1 return. Because whether CCFH's shareholders may ultimately be required to recognize $616 of gain as a result of this loss's disallowance is a legal question, we describe here only the gain recognition compelled by secs. 311(b) and 1366(a).

| Item | Charles and Garnet Carroll | Nancy Cadman | Teri Craig | CCFH | Total |
|---|---|---|---|---|---|
| Capital interest | 79.88% | 2.36% | 2.36% | 15.40% | 100% |
| Capital contributions | $2,716,607 | $80,367 | $80,367 | $523,377 | $3,400,718 |
| Short-term capital loss | (1,811) | (54) | (54) | (349) | (2,268) |
| Interest expense | (1,385) | (41) | (41) | (267) | (1,734) |
| Distributions | (2,713,409) | (80,273) | (80,273) | (522,761) | (3,396,716) |
| Yearend capital account | -0- | -0- | -0- | -0- | -0- |

On the December 31 return, New CNT reported no income, deductions, gains, or losses. On the appended Schedules K–1, New CNT reported capital interests, capital contributions, distributions, and yearend capital accounts as follows:

| Partner | Capital interest (%) | Capital contributions | Distributions | Yearend capital account |
|---|---|---|---|---|
| Charles and Garnet Carroll | 94.4512 | $3,164,116 | --- | $3,164,116 |
| Nancy Cadman | 2.7744 | 92,942 | --- | 92,942 |
| Teri Craig | 2.7744 | 92,942 | --- | 92,942 |
| Total | 100 | 3,350,000 | --- | 3,350,000 |

## B. *CCFH's 1999 Return*

CCFH filed a single Federal income tax return for 1999 on Form 1120S, U.S. Income Tax Return for an S Corporation. On the appended Schedules K–1, Shareholder's Share of Income, Credits, Deductions, Etc., CCFH identified its shareholders and their ownership percentages as: Charles Carroll, 94.4512%; Nancy Cadman, 2.7744%; and Teri Craig, 2.7744%. CCFH's shareholders and their ownership percentages remained unchanged from the beginning of the tax year.

On a Treasury "Reg. Sec. 1.351–3(b) Statement" (351 statement) appended to its return, CCFH reported receiving, as a contribution to capital, an 84.6% interest in CNT having a basis in the transferor's hands of $2,873,955 as of December 1, 1999. Jenkens & Gilchrist provided the 351 statement to Mr. Crowley for attachment to CCFH's 1999 return, and Mr. Mayer told him that it was a "necessary disclosure".

With regard to CCFH's distribution to shareholders of CNT interests, Mr. Mayer explained that disclosure was unnecessary because there had been a "simultaneous transaction". On the basis of this guidance, Mr. Crowley did not report the transaction as a deemed asset sale on Schedule D, Capital

Gains and Losses and Built-In Gains, which he believed would ordinarily be required. Mr. Crowley did not understand Mr. Mayer's explanation but nonetheless followed his instructions. CCFH did not report any short- or long-term capital gain or loss for 1999 and did not file Schedule D that year. It reported total nondividend distributions to shareholders during the year of $245,470.

C. *Individuals' 1999 Returns*

On their respective 1999 Forms 1040, U.S. Individual Income Tax Return, Mr. and Mrs. Carroll, Ms. Cadman and her husband (Cadmans), and Ms. Craig and her husband (Craigs), each couple filing jointly, reported only passthrough ordinary income from CCFH. None of them reported any passthrough capital gain from CCFH, and none of them reported any otherwise taxable distribution from CCFH.

Mr. and Mrs. Carroll filed their 1999 return on October 15, 2000. The Cadmans and the Craigs filed their 1999 returns on October 18, 2000. Respondent received from Mr. and Mrs. Carroll and the Cadmans on September 5, 2006, and from the Craigs on September 8, 2006, signed Forms 872–I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable to Items of a Partnership, extending the period for assessment as to their 1999 tax years to October 15, 2007. On June 28, 2007, respondent received from each couple a second signed Form 872–I extending the limitations period to December 31, 2008.

VI. *Challenging the Transactions*

On August 5, 2008, respondent mailed an FPAA with respect to CNT's December 1 return. In the FPAA, respondent adjusted to zero CNT's reported losses, deductions, distributions, capital contributions, and outside basis for the applicable tax period. The FPAA cites myriad bases for these adjustments, including that CNT was not, as a factual matter, a partnership, lacked economic substance, and was formed or availed of solely for tax avoidance purposes; and that both the Son-of-BOSS transaction and the individual partners' subsequent contribution of their interests to CCFH were sham transactions undertaken solely for tax avoidance purposes. Respondent also determined an

accuracy-related penalty under section 6662 of 20% or 40% of any underpayment attributable to a gross or substantial valuation misstatement, negligence or disregard of rules and regulations, and/or a substantial understatement of income tax.

CNT, through its tax matters partner, Mr. Carroll, timely petitioned this Court on November 12, 2008, for readjustment of partnership items under section 6226, challenging each of respondent's adjustments and all alleged bases for the determined penalty.

OPINION

## I. *Preliminary Matters*

We have listed above only three issues for decision in this case, but the parties have, between them, raised several others. Before proceeding to the issues we will decide, we explain why we do not decide two others: (1) whether the venue for appeal in this case is in the U.S. Court of Appeals for the Ninth Circuit (Ninth Circuit) or the U.S. Court of Appeals for the District of Columbia Circuit (D.C. Circuit); and (2) whether this Court has jurisdiction over the accuracy-related penalty determined in the FPAA. We need not answer the second question because the U.S. Supreme Court has already done so—in the affirmative—in *United States v. Woods*, 571 U.S. ____ , ____, 134 S. Ct. 557, 564 (2013). We need not resolve the first question because, after *Woods*, the answer will not affect our analysis of the substantive issues in this case.

### A. *When Appellate Venue Matters*

Section 7482(b) governs the venue for appeal from a decision of this Court. Where our decision readjusts partnership items pursuant to a petition under section 6226, the appellate venue is the U.S. Court of Appeals for the circuit in which the partnership's principal place of business is located. Sec. 7482(b)(1)(E). If, however, the subject partnership has no principal place of business when the petition is filed, the appellate venue will be the D.C. Circuit. Sec. 7482(b)(1) (flush language); *see also AHG Invs., LLC v. Commissioner*, 140 T.C. 73, 82 (2013) (where it was not established whether a partnership had a principal place of business at the time

the petition was filed, concluding that the case would be appealable in the D.C. Circuit). Respondent contends that CNT had no principal place of business when the petition was filed, and that the D.C. Circuit is the proper venue for appeal. Petitioner, however, insists that the venue for appeal in this case is the Ninth Circuit. [28]

As a trial court, we do not ordinarily opine on the venue for appeal of our decisions. *See Peat Oil & Gas Assocs. v. Commissioner*, T.C. Memo. 1993–130, 65 T.C.M. (CCH) 2259, 2264 (1993). However, this Court "follow[s] a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971). Where the proper venue for appeal determines how we should apply the law, "[w]e believe it appropriate * * * to consider the issue of venue". *Brewin v. Commissioner*, 72 T.C. 1055, 1059 (1979), *rev'd and remanded on other grounds*, 639 F.2d 805 (D.C. Cir. 1981).

B. *Why Appellate Venue Does Not Matter Here*

In their briefs, the parties invoke the *Golsen* rule with respect to two related issues. First, the substantial and gross valuation misstatement penalties apply with respect to any understatement of tax "attributable to" the misstatement. Sec. 6662(b)(3), (h). If the venue for appeal is the Ninth Cir-

---

[28] Respondent argues that he issued the FPAA with respect to CNT's December 1 return, and under sec. 708(b), the partnership for which that return was filed terminated on December 1, 1999, and could therefore have had no principal place of business when the petition was filed nearly seven years later. Moreover, the parties have stipulated that CNT was a sham entity, and respondent contends that a sham entity cannot have a principal place of business. Either way, respondent reasons, the appellate venue is in the D.C. Circuit.

CNT contends that whether a partnership has terminated or is a sham for tax purposes does not affect its legal or factual existence as a legally existing business entity. As evidence of a principal place of business in California, it points to CNT's purported ownership of California real estate and its filing of income tax returns reflecting such ownership and stating a California address. Petitioner alleges that CNT filed such returns "for many years after the sham transfers of property occurred"; that, as a limited liability company, it remains in good standing; and that it has continuously held four of the five mortuary properties since 1999.

cuit, petitioner contends we would be bound to follow that court's decisions in *Keller v. Commissioner*, 556 F.3d 1056 (9th Cir. 2009), *aff'g in part, rev'g in part* T.C. Memo. 2006–131, and *Gainer v. Commissioner*, 893 F.2d 225 (9th Cir. 1990), *aff'g* T.C. Memo. 1988–416, interpreting the phrase "attributable to".

In *Gainer v. Commissioner*, 893 F.2d at 226, the taxpayer purchased an interest in a shipping container at an inflated value, paying most of the purchase price with a promissory note, then claimed an investment tax credit and deducted depreciation on the basis of the inflated value. The Commissioner disallowed the deduction because the container was not placed in service in the tax year at issue, 1981, and also determined a valuation misstatement penalty. *Id.* Affirming this Court, the Ninth Circuit held that the taxpayer's understatement of income tax was not "attributable to" his overstatement of the container's value. *Id.* at 228. Rather, the understatement was attributable to the container's not having been placed in service, a fact that precluded the taxpayer from deducting *any* depreciation. *See id.* In *Keller v. Commissioner*, 556 F.3d at 1060–1061, the Ninth Circuit extended *Gainer*'s reasoning to disallow a gross valuation misstatement penalty where the taxpayer engaged in a sham transaction and then claimed deductions for and reported basis in assets that he never actually acquired. On petitioner's reading, these precedents compel us to disallow any valuation misstatement penalty here because any understatement of tax results from CNT's sham status, not from a valuation misstatement.

In making this argument, petitioner did not have the benefit of the Supreme Court's subsequently released decision in *Woods*. Specifically citing *Keller*, the Supreme Court rejected the premise on which the Ninth Circuit's rule rests—that is, that a transaction's lack of economic substance and an overstatement of basis are necessarily independent possible causes for an understatement of tax. *Woods*, 571 U.S. at ____, 134 S. Ct. at 567. Where "partners underpa[y] their taxes because they overstate[] their outside basis * * * because the partnership[] * * * [is a] sham[]", the Court had "no difficulty concluding that" any resulting underpayment was attributable to the misstatement of outside basis. *Id.* at ____, 134 S. Ct. at 568. *Woods* governs the valu-

ation misstatement penalty's applicability here, regardless of the appellate venue.

Second, under section 6221 we may consider the applicability of a penalty only to the extent that it "relates to an adjustment to a partnership item". If the venue for appeal is the D.C. Circuit, petitioner contends we would be bound to follow that court's decision in *Petaluma FX Partners, LLC v. Commissioner*, 591 F.3d 649 (D.C. Cir. 2010), *aff'g in part, rev'g in part, vacating and remanding in part* 131 T.C. 84 (2008). There, the D.C. Circuit strongly hinted that, where the Commissioner determines that a penalty applies to an understatement of income tax, and that understatement is attributable to an adjustment of outside basis, this Court lacks jurisdiction over the penalty in a partnership-level proceeding because outside basis is an affected item "to be resolved at the partner level". *See id.* at 655–656.

This Court has twice before examined the scope and import of the D.C. Circuit's holding. *See Tigers Eye Trading, LLC v. Commissioner*, 138 T.C. 67, 136–138 (2012); *Petaluma FX Partners, LLC v. Commissioner*, 135 T.C. 581, 586–587 (2010). We need not revisit the question here because, in the interim, the Supreme Court has had the final word. In *Woods*, 571 U.S. at ___, 134 S. Ct. at 564, where the allegedly misstated item was outside basis in a sham partnership, the Supreme Court concluded that a trial court in a partnership-level proceeding has jurisdiction to determine whether the partnership's lack of economic substance can "justify imposing a valuation-misstatement penalty on the partners." Regardless of the appellate venue, *Woods* confirms that we have jurisdiction to consider the valuation misstatement penalty.

We need not invoke the *Golsen* rule for either reason raised by the parties. We will apply the same legal principles to the issues in this case whether the venue for appeal is the D.C. Circuit or the Ninth Circuit. For us to undertake to resolve the correct appellate venue, inasmuch as it would not affect the disposition of this case, "would, at best, amount to rendering an advisory opinion. This we decline to do." *See Greene-Thapedi v. Commissioner*, 126 T.C. 1, 13 (2006).

## II. *Timeliness of the FPAA*

The parties have stipulated that CNT and the Son-of-BOSS transaction were shams. One might view this stipulation as a concession by petitioner of the entire case. It is not. Petitioner offers a defense to the penalties determined in the FPAA, and more importantly, vigorously contests the FPAA's validity in the first instance, claiming that its issuance was untimely.

### A. *Timeliness Under TEFRA*

In the context of an FPAA issued under TEFRA procedures, timeliness for statute of limitations purposes is derivative:

> The Internal Revenue Code prescribes no period during which TEFRA partnership-level proceedings, which begin with the mailing of the * * * [FPAA], must be commenced. However, if partnership-level proceedings are commenced after the time for assessing tax against the partners has expired, the proceedings will be of no avail because the expiration of the period for assessing tax against the partners, if properly raised, will bar any assessments attributable to partnership items.
>
> Generally, in order to be a party to a partnership action, a partner must have an interest in the outcome. If the statute of limitations applicable to a partner bars the assessment of tax attributable to the partnership items in issue, that partner would generally not have an interest in the outcome. See sec. 6226(c) and (d). However, * * * a partner may participate in such action for the purpose of asserting that the period of limitations for assessing any tax attributable to partnership items has expired and that we have jurisdiction to decide whether that assertion is correct. * * *
>
> [*Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 534–535 (2000); fn. refs. omitted.]

Section 6229(a) prescribes a three-year limitations period, commencing on the later of the date on which the partnership return is filed or the last day for filing such return without regard to extensions, for the assessment of tax attributable to any partnership item or affected item. However, we have held that "[s]ection 6229 provides a[n] [alternative] *minimum* period of time for the assessment of any tax attributable to partnership items (or affected items)" that can extend, but not reduce, the limitations period otherwise prescribed by section 6501. *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. at 540–543.

Respondent issued the FPAA with respect to CNT's December 1 return, which covered the taxable period September 15 through December 1, 1999. That taxable period ended within the partners' common 1999 taxable year, so we must ascertain whether the period for assessment for the 1999 tax year had expired as to any or all of CNT's partners when respondent issued the FPAA on August 25, 2008. *See* sec. 706(a) (partner must include partnership items in income in the partner's tax year within or with which the partnership's tax year ends).

It is undisputed that the alternative three-year limitations periods in sections 6501(a) and 6229(a) had both lapsed with respect to all partners' 1999 tax years when respondent issued the FPAA. Instead, respondent hangs his hat on section 6501(e)(1)(A), which extends the limitations period to six years where a taxpayer "omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return".

In that case, the time for assessment would have expired on October 15, 2006, as to Mr. and Mrs. Carroll, and three days later as to the Cadmans and the Craigs.[29] Before their respective expiration dates under section 6501(e)(1)(A), but after their respective expiration dates under sections 6501(a) and 6229(a), Mr. and Mrs. Carroll, the Cadmans, and the Craigs all agreed to extend the periods for assessment for their 1999 tax years, including with respect to tax items attributable to CNT, to October 15, 2007. *See* sec. 6501(c)(4). Before that date, each couple agreed to further extend the limitations period to December 31, 2008. Respondent issued the FPAA before that later date. The FPAA's timeliness therefore turns on whether section 6501(e)(1)(A) applies.[30]

---

[29] CCFH, the fourth partner identified on CNT's December 1 return, was a passthrough entity wholly owned by the named individuals, so we do not consider it separately in our analysis of the applicable limitations periods.

[30] If the FPAA was timely, then it tolled the statute of limitations as to CNT's partners for the duration of this proceeding, until one year after our decision in this case becomes final. *See* sec. 6229(d); *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. 533, 551–557 (2000).

B. *Theory of Omission*

The statute of limitations is an affirmative defense to be pleaded and ultimately proven by petitioner; but because respondent asserts that the six-year statute of limitations in section 6501(e)(1)(A) applies, respondent bears the burden of going forward with the evidence regarding the alleged omission of income. *See Hoffman v. Commissioner*, 119 T.C. 140, 146–147 (2002). If respondent satisfies that burden, then petitioner must introduce evidence of his own to rebut respondent's showing. *See id.* at 146.

Relying on stipulated facts and the tax returns in the record, respondent offers the following: Pursuant to the parties' stipulations, CNT, Teloma, Santa Paula, and S. Mountain are all disregarded as shams, and the transfer of short sale proceeds and related obligations to CNT is also disregarded as a sham. Therefore, CCFH in fact distributed its interest in the highly appreciated assets of CNT (the five mortuary properties) to its shareholders, the Carrolls.

Under section 311(b), if a corporation distributes appreciated property to a shareholder, the corporation must recognize gain as if it had sold the property for fair market value. Where the corporation is an S corporation, that gain passes through and is taxable to the corporation's shareholders pursuant to section 1366(a)(1). Yet neither CCFH nor its shareholders reported any of this gain. Hence, an item of gross income was omitted from CCFH's 1999 Form 1120S and from its three shareholders' 1999 Forms 1040. By respondent's computations, because this omission amounted to more than 25% of gross income for each partner, section 6501(e)(1)(A) applies.

We conclude that respondent has met his burden of going forward with evidence as to the longer, six-year period of limitations. We turn now to petitioner's response. Petitioner offers four alternative reasons section 6501(e)(1)(A) will not avail respondent here. We examine each of these arguments in turn.

C. *Omission by Bootstrapping*

First, petitioner charges respondent with attempting to "bootstrap" an alleged omission by a different taxpayer, using a transaction occurring outside the tax period covered by the

return that is the subject of the FPAA (the December 1 return), to hold open the period of limitations with respect to items reported on that return. Petitioner contends this approach stretches our caselaw too far.

We view petitioner's "bootstrapping" critique as aimed at two mismatches: between CNT and the taxpayers from whose returns the income item was allegedly omitted, and between the tax period covered by the December 1 return and the tax period in which the event giving rise to the income item occurred. Neither of these incongruities is unprecedented.

In *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. at 536, the taxpayer corporation had purportedly transferred property to a partnership in exchange for an interest therein. The Commissioner, discerning a sale disguised as a capital contribution, issued an FPAA adjusting items relating to the purported contribution. *Id.* Before this Court, the Commissioner claimed that while no income had been omitted from the partnership's return, if the FPAA adjustments were sustained, the taxpayer corporation would have failed to report a substantial gain on its own return. *Id.* at 538. Because of this omission by a partner, the six-year limitations period of section 6501(e)(1)(A) would apply with respect to that partner. *See id.* We agreed with the Commissioner's analysis. *See id.* at 551.

Petitioner contends that respondent stretches *Rhone-Poulenc* beyond its moorings by relying on an omission by a third-party entity. But as we have elucidated above, if the FPAA's adjustments are sustained, then it will necessarily follow that Mr. Carroll, Ms. Cadman, and Ms. Craig will each have omitted income from *his or her own* return—that is, passthrough section 311(b) gain, includible under section 1366(a)(1). It is *this* omission, not CCFH's omission of the section 311(b) gain from its 1999 Form 1120S, that would trigger section 6501(e)(1)(A) as to the Carrolls. Granted, the omitted item does not flow through to the individual partners directly from CNT but instead from another source, CCFH. Yet in *Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. at 536, likewise, the omitted item did not flow through to the taxpayer corporation from the partnership but instead arose under section 1001. And here, as in *Rhone-Poulenc*, there will have been an omission only

if the adjustments in the FPAA are sustained. *Id.* at 551. Given these essential similarities, we think that *Rhone-Poulenc* squarely applies to the facts before us. [31]

Petitioner further cites as unprecedented respondent's reliance on an omission arising from a transaction that occurred outside the partnership tax period covered by the subject return. Yet in *Kligfeld Holdings v. Commissioner*, 128 T.C. 192 (2007), we addressed a highly similar situation. There, in 1999, an individual taxpayer engaged in a Son-of-BOSS tax shelter transaction and contributed the proceeds and related obligations to a partnership along with highly appreciated Inktomi stock. *Id.* at 194–195. The partnership sold most of the stock in 1999 but distributed the proceeds and the remaining stock to its partners—the taxpayer and his wholly owned S corporation—in 2000. *Id.* at 197. In 2004 the Commissioner issued to the partnership an FPAA based upon its 1999 Form 1065. *Id.* at 198. The partnership's tax matters partner petitioned this Court and raised a statute of limitations defense. *Id.* at 199.

The Commissioner asserted that the FPAA was timely because the limitations period with respect to the individual taxpayer's 2000 tax year had not expired when the FPAA was mailed, and the adjustments in the FPAA would, if sustained, affect items reported on that taxpayer's 2000 tax return, namely, the distributed proceeds from the stock sale. *See id.* at 199. Scrutinizing TEFRA, we discerned that "Congress anticipated that the taxable year in which an assessment is made would not always be the same as the taxable year in which the adjustments are made." *Id.* at 205. Specifically rejecting the tax matters partner's timing mismatch arguments, we held that the FPAA was timely when issued because the limitations period had not yet run as to the taxable year in which an assessment triggered by the FPAA's adjustments would be made. *Id.* at 202, 206–207.

*Kligfeld Holdings* more than justifies respondent's position here. There, no overlap existed between the taxable period covered by the FPAA and the taxable period for which, if its adjustments were sustained, an assessment would be made. Here, given that the alleged omission arose from a trans-

---

[31] Here the alleged omission results from sustaining the partnership-level adjustments, not from a wholly independent source.

action occurring on December 31, 1999, any assessment as to CNT's partners would be made for their 1999 tax year. CNT's December 1 return covers a period entirely within that same tax year.

Moreover, contrary to petitioner's assertion, there was a third-party entity in play in *Kligfeld Holdings*. As here, the only other partner in the purported partnership created by the individual taxpayer in *Kligfeld Holdings v. Commissioner*, 128 T.C. at 194–195, was his wholly owned S corporation, to which (as occurred here) he contributed a sufficiently large interest in the partnership to trigger a technical termination under section 708(b)(1). And while in *Kligfeld Holdings* the FPAA's adjustments would have flowed through directly to the individual taxpayer's return, sustaining those adjustments would also have resulted in additional pass-through income to the taxpayer under section 1366(a)(1). *See id.* at 199 (explaining Commissioner's position that S corporation should have reported capital gain on the partnership's distribution of cash proceeds from the stock sale).

Between them, *Rhone-Poulenc* and *Kligfeld Holdings* provide ample support for respondent's theory and decisively answer petitioner's "boot-strapping" argument. We therefore proceed to petitioner's second argument.

### D. *Scope of Sham*

Petitioner insists that—pursuant to the parties' stipulation and on the basis of the entire record—*every* step in the series of transactions the Carrolls undertook should be disregarded. Petitioner contends that transfer of the real estate was part of an integrated series sham of transactions, that the entire series should be disregarded, and that CCFH should be treated as the real properties' continuous tax owner. [32]

---

[32] At trial, petitioner introduced a chart comparing the amount of depreciation that could have been taken on the real estate had the transactions at issue not occurred with the depreciation possible after the basis boost for tax years 2002–10. Petitioner's counsel explained that the chart aimed to show the Carrolls' "net tax benefit" from the transactions. We admitted the chart as Exhibit 116. Petitioner also sought to introduce a second chart marked as petitioner's Exhibit 117 which purported to depict the amounts by which New CNT's net income and the flowthrough income of its partners would have increased if the real estate's basis had remained

Continued

Accordingly, petitioner concludes, the transaction generating the allegedly omitted income never occurred, so no income could have been omitted.

Respondent, naturally, demurs. In his view only the Son-of-Boss transaction was a sham because it was entered into solely to artificially eliminate the built-in gain in the real estate, while the remaining steps were cognizable for tax purposes. The parties' arguments implicate three closely related and frequently conflated legal doctrines: the economic substance doctrine, the sham transaction doctrine, and the step transaction doctrine.

Although these doctrines' distinct names might suggest corresponding substantive distinctions, the lines between and among them blur upon examination. Congress reduced prospective confusion as to the economic substance doctrine's

---

unchanged throughout the transaction. Respondent objected to the figures as a hypothetical scenario representing expert opinion, and respondent further disputed the figures themselves. After ascertaining that the numbers in the exhibit had been drawn from proposed amended returns submitted to, but not accepted by, respondent, the Court reserved decision on the exhibit's admission.

With regard to respondent's expert testimony objection, although the exhibit represents a hypothetical, we think it one to which Mr. Crowley could testify as a lay witness under Fed. R. Evid. 701. Mr. Crowley prepared the tax returns that were actually filed. The exhibit reflects how he would have prepared those returns differently pursuant to Internal Revenue Code and Internal Revenue Service (IRS) requirements had the transactions at issue not occurred—in which case, there would have been no sec. 311(b) gain to recognize. No special expertise is needed for a witness to opine on how that witness would have applied undisputed rules differently under hypothetical, alternative circumstances. *See, e.g.*, *United States v. Cuti*, 720 F.3d 453, 457–458 (2d Cir. 2013) (where accountants who had not been qualified as experts testified to how accounts they prepared under undisputed accounting rules would have differed had they been aware of certain facts, finding testimony admissible as lay opinion). We further find Exhibit 117 relevant to petitioner's argument that the events detailed here represent a single, integrated sham transaction and that the parties therefore remain in their pretransaction tax positions. The exhibit reflects petitioner's view of the Carrolls' tax liabilities if his argument prevails. Although Exhibit 117 omits any gain from the transactions at issue, Fed. R. Evid. 401 sets a low bar for relevancy. We will therefore admit the exhibit as relevant to petitioner's aforementioned argument, and for the limited purpose of proving how Mr. Crowley would have prepared the Carrolls' post-1999 returns had the transactions at issue not taken place. We give it weight commensurate with its probative value.

tenets when it codified that doctrine in March 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, sec. 1409, 124 Stat. at 1067–1070 (codified at section 7701(o)). Yet the flurry of commentary that followed the issuance by the IRS of Notice 2014–58, 2014–44 I.R.B. 746, interpreting the codified provision amply demonstrates the degree of remaining uncertainty as to the scope, contours, and sources of economic substance and the other, noncodified judicial doctrines. *See, e.g.*, Jasper L. Cummings, Jr., "The Sham Transaction Doctrine", 145 Tax Notes 1239 (2014); Amy S. Elliott, "Economic Substance Notice's Sham Treatment Prompts Criticism", 145 Tax Notes 377 (2014); Susan Simmonds, "Economic Substance Cases Still Reflect a Vague Doctrine", 146 Tax Notes 32 (2015).

If one looks to the caselaw, the economic substance, sham transaction, and substance over form doctrines resemble a Venn diagram. In a statutorily mandated 1999 study the Joint Committee on Taxation attempted to define and distinguish these three doctrines as well as the business purpose and step transaction doctrines. *See* Staff of J. Comm. on Taxation, Study of Present-Law Penalty and Interest Provisions as Required by Section 3801 of the Internal Revenue Service Restructuring Act of 1998 (Including Provisions Relating to Corporate Tax Shelters) (Vol. I), at 186–198 (J. Comm. Print 1999). The study candidly acknowledges that "[t]hese doctrines are not entirely distinguishable, and their application to a given set of facts is often blurred by the courts and the IRS. There is considerable overlap among the doctrines, and typically more than one doctrine is likely to apply to a transaction." *Id.* at 186.

The doctrines' substantive similarities would not, alone, generate uncertainty for taxpayers (or tenure opportunities for tax academics) if courts applying the doctrines did so using consistent terminology. We have not. [33]

---

[33] We have described the step transaction doctrine, for example, as simply an extension or application of the "substance over form" doctrine. *See, e.g.*, *Holman v. Commissioner*, 130 T.C. 170, 187 (2008) ("'The step transaction doctrine embodies substance over form principles[.]'" (quoting *Santa Monica Pictures, L.L.C. v. Commissioner*, T.C. Memo. 2005–104)), *aff'd*, 601 F.3d 763 (8th Cir. 2010). Similarly, courts have used the term "sham" to characterize transactions lacking economic substance, *see, e.g.*, *United*

Continued

Despite their lexical imprecision, prior opinions of this Court and other courts form a substantial body of precedent for the application of judicial doctrines to disallow tax results in transactions that, on their face, technically strictly conform to the letter of the Code and the regulations. [34] In identifying the source of those doctrines, courts typically point to *Gregory v. Helvering*, 293 U.S. 465 (1935). *Gregory* has come to stand for so many principles that, in order to define our premises before applying them to the facts of this case, what the Supreme Court actually said and what it was doing in that case bear reexamination.

1. *Gregory Revisited*

*Gregory* and subsequent Supreme Court opinions relying upon it contain the seeds of each of the doctrines attributed to it. [35] Mrs. Gregory had conducted a series of transactions

*States v. Woods*, 571 U.S. ___, ___, 134 S. Ct. 557, 567 (2013), or characterized the economic substance and sham transaction doctrines as equivalents, *see, e.g.*, *UnionBanCal Corp. v. United States*, 113 Fed. Cl. 117, 129 n.29 (2013).

[34] Some may quibble with the notion that widely accepted legal doctrines can develop within so short a span as 30 or even 80 years. *See, e.g.*, Jasper L. Cummings, Jr., "The Sham Transaction Doctrine", 145 Tax Notes 1239, 1241 (2014). The common law's development has been described as a "gradual [process], building on past decisions, drawing on new experience, and responding to changing conditions." *See Ohio v. Roberts*, 448 U.S. 56, 64 (1980), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). For better or worse, the pace at which those "conditions" change has inexorably quickened in recent decades. Social, technological, economic, and political changes all occur far more rapidly now than in the days of Blackstone or even Holmes. We do not find it implausible that common law principles should coalesce more swiftly in this environment. Nor, it seems, does Congress, which recognized economic substance as a common law doctrine in 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111–152, sec. 1409, 124 Stat. at 1067–1070 (codified at sec. 7701(o)).

[35] Courts and commentators have variously characterized *Gregory v. Helvering*, 293 U.S. 465 (1935), as: (1) interpolating a business purpose requirement into the predecessor statute of sec. 368, *see, e.g.*, *Bazley v. Commissioner*, 4 T.C. 897, 901–902 (1945), *aff'd*, 155 F.2d 237 (3d Cir. 1946), *aff'd*, 331 U.S. 737 (1947); Cummings, *supra*, at 1246–1247; (2) reading a business purpose requirement into the Code more generally, *see, e.g.*, *Weller v. Commissioner*, 270 F.2d 294, 297 (3d Cir. 1959), *aff'g* 31 T.C. 33 (1958), *and aff'g Emmons v. Commissioner*, 31 T.C. 26 (1958); (3) identifying and disregarding a sham transaction, *see, e.g.*, *Helvering v. Minn.*

that, she asserted, satisfied all requirements for a reorganization under then-applicable law, such that her wholly owned corporation's transfer to her of highly appreciated stock, ensconced within a transient corporate shell, was nontaxable. *See Gregory v. Helvering*, 293 U.S. at 467–468. In its opinion the Supreme Court asked "whether what was done, apart from the tax motive, was the thing which the statute intended." *Id.* at 469. The Court's answer to that question implicates two rationales. First, the Court read the statute to apply only to transfers made in pursuit of a "business or corporate purpose". *See id.* Second, the Court emphasized its focus on the substance, rather than the form, of what had transpired, characterizing the transaction as "a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character". *See id.*

Less than one year later, the Court echoed these two themes in *Helvering v. Minn. Tea Co.*, 296 U.S. 378, 385 (1935), another reorganization case. The Court distinguished the case before it from *Gregory* as involving a "bona fide business move" (i.e., business purpose). *Id.* Further, the Court explained that *Gregory* had "revealed a sham[,] * * * a mere device intended to obscure the character of the transaction", but confirmed that *Gregory* had "disregarded the mask and dealt with realities." *Id.* The Court thus used the word "sham" to describe a transaction, the true "character" of which did not align with its form, and thereby tethered the term "sham" to substance over form principles. *See id.*

---

*Tea Co.*, 296 U.S. 378, 385 (1935); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 95 (4th Cir. 1985), *aff'g in part, rev'g in part* 81 T.C. 184 (1983); (4) enunciating a broad substance over form principle, *see, e.g.*, *Gilbert v. Commissioner*, 248 F.2d 399, 403 (2d Cir. 1957), *remanding* T.C. Memo. 1956–137; Alvin C. Warren, Jr., "The Requirement of Economic Profit in Tax Motivated Transactions", 59 Taxes 985, 986 (1981); and (5) applying the step transaction principle, *see, e.g.*, *Assoc. Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 (10th Cir. 1991). Courts also routinely cite *Gregory* in applying the economic substance doctrine. *See, e.g.*, *ACM P'ship v. Commissioner*, 157 F.3d 231, 246 (3d Cir. 1998), *aff'g in part, rev'g in part* T.C. Memo. 1997–115. *But cf.* David P. Hariton, "Sorting Out the Tangle of Economic Substance", 52 Tax Law. 235, 241–245 (1999) (crediting Judge Learned Hand's opinion for the Court of Appeals for the Second Circuit in *Gregory* as the doctrine's source).

Hence, the sham transaction doctrine originated as an extension of *Gregory*'s substance over form principle.[36] We have described that doctrine as having two strands: (1) a factual sham is a transaction that did not, in fact, take place, and (2) a legal or economic sham, also known as a sham in substance, is a transaction that did take place but that had no independent economic significance aside from its tax implications. *See Krumhorn v. Commissioner*, 103 T.C. 29, 38, 46 (1994). The latter strand can be traced to *Gregory*. In a transaction that is a sham in substance, papers may have been signed and money moved around, but in concrete, economic terms, the transaction is a nullity. Afterward, the parties' beneficial interests remain essentially unchanged.

Courts typically apply the substance over form principle to recharacterize a transaction to make its form (on the basis of which it will be taxed) consistent with the economic, nontax substance of what occurred. When the transaction is an economic sham, such that nothing of substance in fact occurred (or could have occurred as the transaction was structured), we disregard it altogether, just as we would do with a factual sham.[37]

---

[36] We have previously characterized the sham transaction doctrine as founded on or related to substance over form principles. *See, e.g.*, *Klaas v. Commissioner*, T.C. Memo. 2009–90, 97 T.C.M. (CCH) 1467, 1472 (2009), *aff'd*, 624 F.3d 1271 (10th Cir. 2010); *Andantech L.L.C. v. Commissioner*, T.C. Memo. 2002–97, 83 T.C.M. (CCH) 1476, 1501 (2002), *aff'd in part and remanded on other grounds*, 331 F.3d 972 (D.C. Cir. 2003); *Gaw v. Commissioner*, T.C. Memo. 1995–531, 70 T.C.M. (CCH) 1196, 1226 (1995), *aff'd without published opinion*, 111 F.3d 962 (D.C. Cir. 1997).

[37] *Knetsch v. United States*, 364 U.S. 361, 365–366 (1960), the first tax case in which the Supreme Court used the phrase "sham transaction", illustrates this rationale. Mr. Knetsch purchased from an insurance company an annuity contract "with a so-called guaranteed cash value at maturity * * * which would produce * * * substantial life insurance proceeds in the event of his death before maturity." Pursuant to the contract, however, he also borrowed repeatedly and regularly against the annuity's cash value, such that "the net cash value, on which any annuity or insurance payments would depend," remained negligible. *Id.* at 366. He claimed a deduction for interest paid on the loans under sec. 163. *Id.* at 363–364. Quoting *Gregory*, the Court asked "'whether what was done, apart from the tax motive, was the thing which the statute intended'" and concluded the answer was no. *Id.* at 365 (quoting *Gregory v. Helvering*, 293 U.S. at 469). The alleged premium and interest payments simply offset the alleged loans and "did 'not appreciably affect * * * [the taxpayer's] beneficial interest except to reduce his tax'". *See id.* at 365–366 (quoting *Gilbert v.*

Only five years later, in *Higgins v. Smith*, 308 U.S. 473, 476 (1940), the Court deemed substance over form a "broad and unchallenged principle". The taxpayer in that case had claimed an ordinary loss deduction in connection with a sale of securities to his wholly owned corporation, which he had created solely to achieve income and estate tax savings. *See id.* at 474–475. Because substance over form "furnishe[d] only a general direction", the Court looked to *Gregory*'s business purpose theme and extrapolated from it: "[If] the *Gregory* case is viewed as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability, it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration." *Id.* at 476. *Gregory*, the Court implied, supports the twin propositions that any property transfer must have a nontax purpose and that transactions without nontax, economic consequences may be disregarded for tax purposes. *See id.* These propositions now make up the two prongs of the codified economic substance doctrine. [38]

*Gregory*, as interpreted by the Court in its subsequent opinions, spawned the economic substance, sham transaction, business purpose, and substance over form doctrines. [39] We

---

*Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (Learned Hand, J., dissenting)). "What he was ostensibly 'lent' back was in reality only the rebate of a substantial part of" his interest payments. *Id.* at 366. In sum, "there was nothing of *substance* to be realized by Knetsch from this transaction beyond a tax deduction." *Id.* (emphasis added). Hence, it was a "sham." *Id.*

[38] Congress has mandated that, in applying "the common law doctrine under which tax benefits * * * with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose" to any transaction to which it is "relevant", the Federal courts use a conjunctive test. Sec. 7701(o)(1), (5)(A). Of course, the transactions at issue occurred before codification, so if we were to apply the economic substance doctrine in this Opinion, we would do so on the basis of relevant caselaw rather than in accordance with the later-enacted statute. We will not apply the doctrine, however, because the Government has not invoked the doctrine and because, in any event, the case may be resolved through the application of other principles.

[39] As an extension of the substance over form principle, *see supra* note 33, the step transaction doctrine likewise finds its roots in *Gregory*. When a group of transactions is so "integrated", "interdependent", and "focused

Continued

do not trace these doctrines back to *Gregory* in order to add to the extensive literature parsing *Gregory* and related caselaw, or in order to propose a discrete doctrinal taxonomy. We source the judicial doctrines to *Gregory* to draw attention not to what the Court said, but to what it was doing, in that case and subsequent cases.

*Gregory*, like much of the caselaw using the economic substance, sham transaction, and other judicial doctrines in interpreting and applying tax statutes, represents an effort to reconcile two competing policy goals. On one hand, having clear, concrete rules embodied in a written Code and regulations that exclusively define a taxpayer's obligations (1) facilitates smooth operation of our voluntary compliance system, (2) helps to render that system transparent and administrable, and (3) furthers the free market economy by permitting taxpayers to know in advance the tax consequences of their transactions. On the other side of the scales, the Code's and the regulations' fiendish complexity necessarily creates space for attempts to achieve tax results that Congress and the Treasury plainly never contemplated, while nevertheless complying strictly with the letter of the rules, at the expense of the fisc (and other taxpayers).

In *Gregory*, the Court confronted such an extreme result and, on the basis of equitable principles, interpreted and applied the relevant statute so as to subject Mrs. Gregory's transaction to tax. Likewise, the various other judicial doctrines applied in tax cases all represent efforts to rein in activity that, while within the technical letter of the rules, deeply offends their spirit.[40] Attempts to parse and define the doctrines merely intellectualize what is, ultimately, an equitable exercise. Those who favor transparency might

_____

on a particular end result" that evaluating the tax consequences independently will not "reflect[ ] the actual overall result", we disregard the transactions' formal separateness and treat them, in substance, as one. *See Gordon v. Commissioner*, 85 T.C. 309, 324 (1985); *see also Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 88–90 (2011), *aff'd*, 728 F.3d 676 (7th Cir. 2013).

[40] Such efforts lie squarely within the courts' role in interpreting the law in ways consistent with congressional intent. "[C]ourts in the interpretation of a statute have some scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results, * * * or would thwart the obvious purpose of the statute". *Helvering v. Hammel*, 311 U.S. 504, 510–511 (1941).

prefer a strictly circumscribed taxonomy of judicial doctrines, to include exclusive definitions of the circumstances in which they should be applied. Those who favor administrability, protection of the fisc, and respect for congressional purpose might prefer that courts exercise carte blanche in disallowing results of transactions perceived as abusive. *Gregory* and its progeny represent an ongoing effort to reconcile these opposing principles and methodologies. Litigants and courts employ specialized terminology to make this effort appear more rigorous, but candidly, underneath, we are simply engaged in the difficult, commonsense task of judging.

We attempt to apply *Gregory*'s teachings to the transactions at issue.

### 2. *Sham Transaction Doctrine*

The parties have stipulated numerous exhibits—including real estate deeds, account agreements, trade confirmations, and account statements—demonstrating that the transactions at issue actually occurred, so we consequently focus on the economic sham strand of the sham transaction doctrine. *See Krumhorn v. Commissioner*, 103 T.C. at 38, 46 (distinguishing factual shams from shams in substance). We ask whether any of these transactions had "nontax substance" or affected the parties' beneficial interests other than by reducing their tax obligations. *See Knetsch v. United States*, 364 U.S. 361, 366 (1960).

The parties have stipulated that CNT, Teloma, Santa Paula, and S. Mountain were sham entities with no business purpose. They have likewise stipulated that the Carrolls' purported contribution of short sale proceeds and related obligations (along with a nominal amount of cash) to CNT in exchange for partnership interests in CNT was a sham transaction with no business purpose. They have not, however, stipulated that any of the other transactions at issue, nor the entire series of transactions, constitutes a sham. On the basis of our factual findings and review of the record, we identify six separate actions undertaken here: (1) CCFH contributed the five mortuary properties to CNT; (2) the Carrolls opened short sale positions; (3) the Carrolls contributed those short sale positions to CNT; (4) CNT closed the short sale positions; (5) the Carrolls contributed their CNT interests to CCFH; and (6) CCFH distributed New CNT

interests to its shareholders. Following *Knetsch*, we must determine whether these transactions had "nontax substance" and were thus what they purported to be—that is, not economic shams.

Examining each step independently (before determining whether and to what extent the step transaction doctrine should apply), we find that steps (1), (3), and (5) were all sham transactions, principally because CNT was a sham entity. The parties have stipulated, and the record reflects, that CNT lacked any legitimate business purpose. Rather, it was formed solely as a vehicle for effecting the Son-of-BOSS transaction and artificially "boosting" the real estate's aggregate adjusted tax basis. Hence, consistent with the parties' stipulation, it was a sham partnership. *See Commissioner v. Culbertson*, 337 U.S. 733, 742 (1949) (explaining that, to form a valid partnership under Federal law, "the parties in good faith and acting with a business purpose [must] intend[ ] to join together in the present conduct of the enterprise"). We therefore disregard its existence. *See, e.g.*, *Sparkman v. Commissioner*, 509 F.3d 1149, 1156 n.6 (9th Cir. 2007), *aff'g* T.C. Memo. 2005–136; *Andantech L.L.C. v. Commissioner*, 331 F.3d 972, 980 (D.C. Cir. 2003), *aff'g and remanding* T.C. Memo. 2002–97, 83 T.C.M. (CCH) 1476 (2002); *see also Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 439 (1943) (explaining, in a tax case, that "the corporate form may be disregarded when it is a sham or unreal").

We likewise disregard as shams the purported contributions of property to, and contributions of interests in, the sham partnership that occurred at steps (1), (3), and (5). Although deeds were signed and funds moved among accounts, economically, the parties' positions did not change. CCFH and the Carrolls could not have contributed property in exchange for interests in a nonexistent partnership. They acquired nothing of substance and relinquished nothing of substance. A transaction undertaken with a sham entity is, a fortiori, a sham.

We further conclude that steps (2) and (4), together, constituted a sham transaction. The Carrolls opened the short sale positions, and—disregarding the positions' purported contribution to the sham partnership, CNT—closed them mere days later pursuant to a prearranged plan. Pursuant to that same plan, during the brief period for which the short

sale positions remained open, the short sale proceeds were invested in the same T-notes sold short, in an almost identical amount, thereby reducing to near zero the risk of a loss on the short sale. Conversely, respondent's expert concluded, and petitioner does not specifically dispute, that the short sale as structured had virtually no chance of generating a profit. As designed, the short sale could have had no lasting economic consequence and would alter only the individuals' tax positions, through the creation of basis in a purported partnership. [41] Hence, like the offsetting premium payments and loans in *Knetsch*, which "did 'not appreciably affect * * * [the taxpayer's] beneficial interest except to reduce his tax'", steps (2) and (4) constitute an economic sham. *See Knetsch*, 364 U.S. at 365–366 (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (Learned Hand, J., dissenting)); *see also, e.g.*, *Horn v. Commissioner*, 968 F.2d 1229, 1236 (D.C. Cir. 1992) (describing an economic sham as a transaction structured "in such a way as to create the tax benefits while completely avoiding economic risk"), *rev'g Fox v. Commissioner*, T.C. Memo. 1988–570, *and rev'g Kazi v. Commissioner*, T.C. Memo. 1991–37; *Neely v. United States*, 775 F.2d 1092, 1094 (9th Cir. 1985) (defining a sham transaction as "one having no economic effect other than to create income tax losses").

Step (6), however, was different. If, for the reasons explained above, we disregard the preceding steps as shams and look through New CNT to its then partners, at this step CCFH transferred the five mortuary properties to the Carrolls. This transfer materially changed the Carrolls' and CCFH's economic positions, entirely aside from tax considerations. CCFH was a passthrough entity for tax purposes, but for other legal purposes it was a legal entity distinct from its owners. The parties have not stipulated, and the record does not reflect, that CCFH was a sham entity. On the contrary, CCFH was a going concern that had operated a viable business and held the real properties for several years, not an

---

[41] Although as explained *supra* note 38, we do not herein apply the economic substance doctrine, the facts suggest that the T-note short sale also ran afoul of that doctrine. The parties have stipulated that Mr. Carroll had never before engaged in a short sale or any remotely similar financial transaction. Petitioner has offered, and we can discern, no nontax purpose for the T-note short sale.

ephemeral shell created solely for this series of transactions. In distributing the real estate to its shareholders, it reduced its balance sheet and lost the right to control and dispose of a valuable asset. Its shareholders, meanwhile, acquired the "bundle of rights" associated with ownership of real property. In particular, the Carrolls acquired the right to lease and receive rental income from the properties, as they had contemplated doing. All obligations connected with ownership of land likewise passed from CCFH to the Carrolls.

Moreover, as petitioner essentially acknowledges, a substantial, nontax purpose motivated the transfer, and attainment of that purpose altered the parties' economic positions in a meaningful way. The Carroll family wanted to retire from the mortuary business and hoped to sell the funeral home, retaining the real estate as a source of ongoing income. Their advisers had concluded that the best means of achieving this goal would be to separate the real estate from the operating assets by transferring the real estate out of CCFH. In sharp contrast to the annuity arrangement in *Knetsch*, this transaction's participants *did* realize something of substance beyond a tax deduction: They implemented the business disposition and rental income retirement plan recommended by their advisers.

For the foregoing reasons, we conclude that step (6) had nontax substance, and we will not disregard CCFH's transfer of the real estate as a sham transaction.

Petitioner, however, repeatedly emphasizes that the Carrolls and their advisers refrained from causing CCFH to transfer the real estate until they had identified an ostensible means of accomplishing it without tax consequences. He contends that, but for the Son-of-BOSS transaction, the real estate would never have been transferred at all. This contention essentially invokes the step transaction doctrine. Even if, on its own, step (6) had nontax substance, must we nevertheless disregard it because it was part and parcel of an integrated sham transaction?

### 3. *Step Transaction Doctrine*

It is axiomatic that "a transaction's true substance rather than its nominal form governs its Federal tax treatment." *Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 88 (2011), *aff'd*, 728 F.3d 676 (7th Cir. 2013); *see also Commis-*

*sioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction."). Before recharacterizing a transaction's form to align with its substance, we conduct "a searching analysis of the facts to see whether the true substance of the transaction is different from its form or whether the form reflects what actually happened." *Harris v. Commissioner*, 61 T.C. 770, 783 (1974); *see also Gordon v. Commissioner*, 85 T.C. 309, 324 (1985) ("[F]ormally separate steps in an integrated and interdependent series that is focused on a particular end result will not be afforded independent significance in situations in which an isolated examination of the steps will not lead to a determination reflecting the actual overall result of the series of steps.").

Three alternative tests of varying degrees of permissiveness exist for determining whether to invoke the step transaction doctrine: the binding commitment test, the end result test, and the interdependence test. *Superior Trading, LLC v. Commissioner*, 137 T.C. at 88. "[A] transaction need only satisfy one of the tests to allow for the step transaction doctrine to be invoked." *Id.* at 90.

Under the binding commitment test, we ask whether, at the time of the first step to occur, there was a binding commitment to undertake the subsequent steps. *See Commissioner v. Gordon*, 391 U.S. 83, 96 (1968). Courts have seldom used this test, and we have typically applied it only where "'a substantial period of time has passed between the steps that are subject to scrutiny.'" *Superior Trading, LLC v. Commissioner*, 137 T.C. at 89 (quoting *Andantech LLC v. Commissioner*, 83 T.C.M. (CCH) at 1504). Because all steps here occurred within little over one month, the binding commitment test is likely inappropriate to these circumstances. *See id.*; *see also Assoc. Wholesale Grocers, Inc. v. United States*, 927 F.2d 1517, 1522 n.6 (10th Cir. 1991) (declining to apply binding commitment test where case did not involve series of transactions over multiple years).[42]

Under the end result test, we examine "whether the formally separate steps are prearranged components of a composite transaction intended from the outset to arrive at a

---

[42] Were we to apply the test regardless, it would not alter our ultimate conclusion because the transactions at issue satisfy the other two tests.

specific end result." *Superior Trading, LLC v. Commissioner*, 137 T.C. at 89; *see also True v. United States*, 190 F.3d 1165, 1175 (10th Cir. 1999) (observing that what matters is whether the parties "intended to reach a particular result by structuring a series of transactions in a certain way"). The interdependence test similarly asks whether the various steps are so interdependent that each alone accomplishes no independent business purpose and "would have been fruitless without completion of the later series of steps." *Superior Trading, LLC v. Commissioner*, 137 T.C. at 90. Petitioner readily admits that the series of transactions undertaken by the Carrolls and their wholly owned entities were orchestrated solely to achieve a particular goal, established at the outset, of removing the real estate from CCFH and that each step in the series would not have occurred but for the others. Under either the end result test or the interdependence test, then, the step transaction doctrine plainly applies.

We thus collapse the series of transactions into one, disregarding CNT, Teloma, Santa Paula, and S. Mountain as sham entities pursuant to the parties' stipulation. Before the series of transactions began, CCFH owned the five mortuary properties. When the dust settled, Mr. Carroll, Ms. Cadman, and Ms. Craig owned the properties. Accordingly, the "stepped" transaction is a transfer of the five properties by CCFH to the three individuals, and for the reasons discussed above, that transaction had nontax substance. It was not, as petitioner would have it, a nonevent. "[I]n cases where a taxpayer seeks to get from point A to point D and does so stopping in between at points B and C", we apply the step transaction doctrine to ignore the interim stops, *Smith v. Commissioner*, 78 T.C. 350, 389 (1982), not to return the taxpayer to point A.

The foregoing conclusion is decidedly not the one petitioner seeks. Rather than simply stop there, we must consider a strand of authority he raises on brief that, in effect, blends the sham and step transaction doctrines.

### 4. *Blending the Doctrines*

Where a sham transaction consists of multiple steps, we have recognized that "there is authority [for the proposition] that a sham transaction may contain elements whose form reflects economic substance and whose normal tax con-

sequences therefore may not be disregarded." *Alessandra v. Commissioner*, T.C. Memo. 1995–238, 69 T.C.M. (CCH) 2768, 2770, 2773 (1995) (requiring inclusion of income generated by T-bills purchased and interest-bearing account opened in connection with a sham transaction), *aff'd without published opinion*, 111 F.3d 137 (9th Cir. 1997).

In most such cases, courts determined that interest paid on bona fide indebtedness could be deducted even when the indebtedness had been incurred in connection with or in anticipation of a sham transaction. *See, e.g.*, *Jacobson v. Commissioner*, 915 F.2d 832, 840 (2d Cir. 1990) (concluding that interest and loan commitment fees were deductible), *aff'g in part, rev'g in part on other grounds* T.C. Memo. 1988–341; *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987) (finding that a loan was a sham, but implying that if it were bona fide, interest would be deductible), *aff'g* T.C. Memo. 1986–23; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 96 (4th Cir. 1985) (in a sham sale-leaseback transaction financed with notes, holding that taxpayer could deduct interest paid on a recourse note because it represented a genuine obligation), *aff'g in part, rev'g in part* 81 T.C. 184 (1983); *Rose v. Commissioner*, 88 T.C. 386, 423–424 (1987) (allowing deduction of interest payments "attributable to the forbearance of amounts due on genuine indebtedness" in connection with a transaction lacking economic substance), *aff'd*, 868 F.2d 851 (6th Cir. 1989).

On the other hand, we have declined to sever interest payments from a multistep sham transaction where the interest payments were "an integral part of the tax-motivated sham." [43] *Alessandra v. Commissioner*, 69 T.C.M. (CCH) at 2772; *see, e.g.*, *Sheldon v. Commissioner*, 94 T.C. 738, 762 (1990) (disallowing deductions for interest owed to securities repo counterparties where the repo transactions "lacked tax-independent purpose"); *Seykota v. Commissioner*, T.C. Memo. 1991–541, 62 T.C.M. (CCH) 1116, 1117, 1119 (1991) (dis-

---

[43] In such cases we disregard both the income and the deductions generated by the sham transaction. *See Sheldon v. Commissioner*, 94 T.C. 738, 762 (1990); *see also Arrowhead Mountain Getaway Ltd. v. Commissioner*, T.C. Memo. 1995–54, 69 T.C.M. (CCH) 1805, 1821–1822 (1995), *aff'd without published opinion*, 119 F.3d 5 (9th Cir. 1997); *Seykota v. Commissioner*, T.C. Memo. 1991–541, 62 T.C.M. (CCH) 1116, 1118 (1991).

allowing current-year deductions for interest paid to a commercial lender where the taxpayer borrowed the funds to purchase capital assets that would be sold in the following tax year, thereby both deferring recognition of income and converting ordinary income to capital gain); *see also Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966) (affirming disallowance of interest deductions where debt was incurred solely for its anticipated tax consequences), *aff'g* 44 T.C. 284 (1965).

Petitioner argues that the latter strand of caselaw governs here because CCFH's transfer of the real estate was "integral" to the sham Son-of-BOSS transaction and would not have occurred but for that transaction. Thus, petitioner asks us to disregard the tax consequences flowing from the transfer and to hold, for tax purposes, that CCFH still owns the real estate.

Petitioner's characterization of the real estate's transfer as a mere component of a sham transaction represents a category mistake.[44] Transferring the real estate was the reason for and objective of the series of transactions at issue, not simply one of the transactions. Taxpayers have most commonly used Son-of-BOSS transactions retrospectively, to offset recognized gains from unrelated, completed transactions. *See supra* note 7. Here, the Carrolls used the Son-of-BOSS transaction prospectively, to avoid recognizing gains on a planned transaction—to wit, separation of the real estate from the funeral home business. We think this a distinction without a difference. A Son-of-BOSS transaction is a tax shelter undertaken, as its moniker implies, to offset, or "shelter", income that would otherwise be subject to tax. Neither the sham transaction doctrine nor the step transaction doctrine nor the two combined requires us to disregard the income-producing event along with the shelter transaction designed to offset it. Such an interpretation would render the doctrines toothless and yield absurd results.

None of the cases petitioner cites as supporting his position persuades us otherwise. In *Sheldon v. Commissioner*, 94 T.C.

---

[44] "[A] category mistake treats a concept 'as if [it] belonged to one logical type or category * * * when [it] actually belong[s] to another'". *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 930 n.21 (9th Cir. 2004) (quoting Gilbert Ryle, The Concept of Mind 15 (1949)).

at 762, where we disallowed interest deductions generated by sham repo transactions, we held that the taxpayers need not recognize the "relatively small amounts of interest income" generated by the transactions; we did not discuss, much less disregard as shams, the transactions that had produced the ordinary income the taxpayers presumably hoped to shelter with the interest deductions. *Accord Arrowhead Mountain Getaway Ltd. v. Commissioner*, T.C. Memo. 1995–54, 69 T.C.M. (CCH) 1805 (1995), *aff'd without published opinion*, 119 F.3d 5 (9th Cir. 1997); *Seykota v. Commissioner*, T.C. Memo. 1991–541.

In *United States v. Wexler*, 31 F.3d 117, 126 (3d Cir. 1994), a criminal tax fraud case, the Court of Appeals for the Third Circuit found clear error in a jury instruction that would have recognized as valid interest deductions "constituting the tax benefits of the entire [sham] transaction." The "profits from other transactions" that had been offset by these deductions were not at issue. *See id.* at 120. And in *Goldstein*, where we disallowed deductions of interest paid on loans that were shams, we did not hold that the taxpayer need not recognize the sweepstakes income that her son had engineered the loans to offset. *Goldstein v. Commissioner*, 44 T.C. at 286–287, 296, 300 (likewise disallowing interest on loans incurred solely to obtain a deduction, without concurrently disregarding sweepstakes income).

We would no more disregard the transfer of the real estate here than we would Mrs. Goldstein's sweepstakes win. Here, the gain-producing transaction and the shelter transaction occurred pursuant to a plan, and the shelter transaction arguably preceded realization of the gains it was designed to shield. But if we were to disregard the gain-producing transaction along with the shelter transaction, we would encourage taxpayers to hedge against the audit lottery by structuring their tax shelter transactions to precede and intertwine with their income-producing activities. We will not do so. "[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not". *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974).

5. *Conclusion*

In sum, we hold that the step transaction doctrine applies to the transactions undertaken by the Carrolls; that application of that doctrine collapses the various transactions to a transfer of the real estate from CCFH to the Carrolls; and that this transfer was not simply part and parcel of a larger sham transaction. We will not disregard the transfer or the gain it generated.

E. *Definition of Omission*

Although we will not disregard CCFH's transfer of the real estate as petitioner urges, he has another arrow in his quiver. He contends that, under the Supreme Court's decision in *United States v. Home Concrete Supply, LLC*, 566 U.S. ____, 132 S. Ct. 1836 (2012), the allegedly omitted item—gain recognized on CCFH's distribution of appreciated property to its shareholders—does not constitute an omission within the meaning of section 6501(e)(1)(A) because it derives entirely from an overstatement of outside basis.

In *Home Concrete*, 566 U.S. at ____, 132 S. Ct. at 1841, the Supreme Court held that its interpretation in *Colony, Inc. v. Commissioner*, 357 U.S. 28, 36 (1958), of a prior version of section 6501(e)(1)(A) applies with equal force to the current statute: To "omit" an amount properly includible in gross income is to leave something out entirely. When a taxpayer "*overstates his basis* in property that he has sold, thereby *understating the gain* that he received from its sale*", section 6501(e)(1)(A) does not apply. *Home Concrete*, 566 U.S. at ____, 132 S. Ct. at 1839. In such a case, the taxpayer has reported, not omitted, the item of gain, albeit in an incorrect amount.

As we have explained, respondent's theory here is that, in purporting to distribute interests in New CNT to its shareholders, CCFH in fact distributed the appreciated real estate. Both CCFH (under section 311(b)) and its shareholders (under section 1366(a)(1)) should have reported gain as if the property had been sold for its fair market value. Neither CCFH, nor Mr. Carroll, nor Ms. Cadman, nor Ms. Craig reported this gain. Hence, respondent concludes, CNT's partners each entirely left out an income item from its, his, or her return, so *Home Concrete*'s rule is inapposite.

If one considers the supposed omission from a different angle, however, *Home Concrete* appears far more relevant. The amount of gain that the partners were obliged but failed to report was the difference between the real estate's aggregate fair market value and its adjusted tax basis. *See* secs. 311(b), 1001(a), 1366(a)(1). If that difference was zero because CCFH had overstated its basis in the real estate as equal to the real estate's fair market value, then *Home Concrete* would apply squarely to the alleged omission. The Son-of-BOSS transaction in which the Carrolls engaged was designed to inflate the real estate's tax basis so as to eliminate or minimize the tax consequences when CCFH transferred the property. Basis overstatement was the essence of the transaction. Hence, we must determine whether the allegedly omitted gain derives entirely from a basis overstatement, and if so, whether the correction of that overstatement by respondent is barred by the statute of limitations.

We have concluded that for tax purposes CCFH transferred the property directly to the Carrolls. In our findings, we found that this transfer would have resulted in recognition of $3,496,623 of gain under section 311(b), and we also described the tax treatment the Carrolls intended their transactions to receive. Even affording the transactions and entities involved the Carrolls' desired tax treatment *and accepting all overstatements of basis as accurate*, CCFH should have recognized and reported $623,284 of gain under section 311(b) on its distribution of CNT interests to its shareholders. CCFH did not report *any* gain. Hence, of CCFH's omitted section 311(b) gain, $623,284 of the omitted amount cannot be explained by the basis overstatement resulting from the Son-of-BOSS transaction. Therefore, under section 1366(a)(1), *even accepting all overstatements of basis as accurate*, CCFH's shareholders should have included a total of $623,284 of gain in their income, allocated among them in the following amounts:

| Shareholder | Amount |
| --- | --- |
| Mr. Carroll | $588,699.22 |
| Ms. Cadman | 17,292.39 |
| Ms. Craig | 17,292.39 |
| Total | 623,284.00 |

None did so. Because these omissions cannot be attributed to a basis overstatement, *Home Concrete* does not necessarily bar the application of section 6501(e)(1)(A).

To determine whether these omissions exceeded 25% of "the amount of gross income stated in the return", sec. 6501(e)(1)(A), for Mr. Carroll, Ms. Cadman, and/or Ms. Craig, we must first compute the amounts of gross income stated in their respective 1999 Federal income tax returns, each of which was filed jointly with a spouse. For this purpose "'gross income' means those items listed in section 61(a), which includes, among other things, gains derived from dealings in property." *Insulglass Corp. v. Commissioner*, 84 T.C. 203, 210 (1985) (quoting section 6501(e)(1)(A)). Gross income does not, however, include losses derived from dealings in property, as section 62, not section 61, provides for the deduction of such losses. *Schneider v. Commissioner*, T.C. Memo. 1985–139, 49 T.C.M. (CCH) 1032, 1034 (1985); *see also Barkett v. Commissioner*, 143 T.C. 149, 152–156 (2014) (reaffirming *Insulglass* and *Schneider* and holding that, outside the context of sales of goods or services, gross income is calculated under the general statutory definition, such that gain from the sale of investment property, not amount realized, is includible).

Section 6501(e)(1)(A)(i) provides a corollary to the general rule that gross income comprises only those items identified in section 61: "In the case of a trade or business, the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services * * * prior to diminution by the cost of such sales or services". Thus "[i]n the case of a trade or business, 'gross income' is equated with gross receipts." *Insulglass Corp. v. Commissioner*, 84 T.C. at 210. We apply these principles to Mr. Carroll, Ms. Cadman, and Ms. Craig, in turn.

## 1. *Mr. Carroll*

Beginning with Mr. Carroll, he and Mrs. Carroll reported the following items of income on their 1999 Form 1040: $36,000 of wages, salaries, and/or tips, $33,220 of taxable interest, $963 of taxable refunds, credits, or offsets of State and local income tax, and $23,028 of taxable Social Security benefits. These amounts all constitute income within the meaning of section 61 and thus are all includible in Mr.

Carroll's stated gross income. *See* sec. 61(a); *Insulglass Corp. v. Commissioner*, 84 T.C. at 210. Mr. and Mrs. Carroll also reported $1,811 of capital loss, which represented their distributive share of the short-term capital loss CNT reported on its December 1 return, but we will not reduce Mr. Carroll's stated gross income by the amount of this loss. *See Schneider v. Commissioner*, 49 T.C.M. (CCH) at 1034. In sum, Mr. Carroll reported $93,211 of nonbusiness gross income.

Mr. and Mrs. Carroll also reported income on Schedule E, Supplemental Income and Loss, from three business activities: (1) CNT, [45] (2) CCFH, and (3) "Business Interest Charles Carroll", an S corporation. CNT reported no gross receipts for either of its short tax years in 1999. CCFH reported gross receipts of $1,841,144 for 1999, of which Mr. and Mrs. Carroll's 94.4512% share was $1,738,982.60. The record contains no evidence of gross receipts to associate with "Business Interest Charles Carroll", nor any other evidence regarding that activity. Hence, on the record before us, Mr. Carroll reported a total of $1,738,982.60 of business gross income.

For purposes of applying section 6501(e)(1)(A), Mr. Carroll's 1999 stated gross income equals the sum of his nonbusiness income and his share of the three business activities' gross receipts—that is, $1,832,193.60, 25% of which is $458,048.40; $588,699.22 exceeds that amount. Hence, Mr. Carroll's omission exceeded 25% of his stated gross income.

2. *Ms. Cadman*

Turning to Ms. Cadman, for 1999 she and her husband reported $98,528 of wages, salaries, and/or tips, $6 of taxable interest, $16 of ordinary dividends, $915 of taxable refunds, credits, or offsets of State and local income tax, and $61,321 of taxable pension and annuity distributions. These amounts all constitute income within the meaning of section 61 and thus are all includible in Ms. Cadman's stated gross income. *See* sec. 61(a); *Insulglass Corp. v. Commissioner*, 84. T.C. at

---

[45] As the parties have stipulated, and as we have found, CNT was a sham entity with no business purpose. However, we will treat CNT as a business within the context of this analysis because we consider here the omissions that would exist even if we were to afford the Carrolls and their business entities their desired tax treatment.

210. The Cadmans also reported $143 of capital loss. This amount represented the sum of Ms. Cadman's $54 distributive share of the net short-term capital loss CNT reported on its December 1 return and her $89 distributive share of the net long-term capital loss reported for the 1999 tax year by an unrelated partnership in which she was a partner. As with Mr. Carroll, we will not reduce Ms. Cadman's stated gross income by the amounts of these capital losses. *See Schneider v. Commissioner*, 49 T.C.M. (CCH) at 1034. In sum, Ms. Cadman reported $160,786 of nonbusiness gross income.

Like Mr. and Mrs. Carroll, the Cadmans did not file Schedule C, Profit or Loss from Business. Also like Mr. and Mrs. Carroll, they listed three activities on Schedule E: CNT, CCFH, and the unrelated partnership. As noted above, CNT reported no gross receipts for either of its short 1999 tax years. Ms. Cadman's 2.7744% share of CCFH's 1999 gross receipts was $51,080.70. Like CNT, the unrelated partnership reported no gross receipts on its 1999 Form 1065. Hence, Ms. Cadman reported a total of $51,080.70 of business gross income.

For purposes of applying section 6501(e)(1)(A), Ms. Cadman's 1999 stated gross income equals the sum of her nonbusiness income and her share of the three business activities' gross receipts—that is, $211,866.70, 25% of which is $52,966.68; $17,292.39 does not exceed that amount. Hence, Ms. Cadman's omission did not exceed 25% of her stated gross income.

### 3. *Ms. Craig*

Ms. Craig and her husband reported $51,129 of wages, salaries, and/or tips, $1,486 of taxable interest, and $16 of ordinary dividends. These amounts all constitute income within the meaning of section 61 and consequently are all includible in Ms. Craig's stated gross income. *See* sec. 61(a); *Insulglass Corp. v. Commissioner*, 84 T.C. at 210. The Craigs also reported $144 of capital loss. This amount represented the sum of Ms. Craig's $54 distributive share of the net short-term capital loss CNT reported on its December 1 return and her $89 distributive share of the net long-term capital loss reported for the 1999 tax year by the same unrelated partnership in which Ms. Cadman was a partner. We

will not reduce Ms. Craig's stated gross income by the amounts of these capital losses. *See Schneider v. Commissioner*, 49 T.C.M. (CCH) at 1034. In sum, Ms. Craig reported $52,631 of nonbusiness gross income.

On Schedule C Ms. Craig and her husband reported gross receipts of $112,138 from "Mark Craig Productions", a music production activity. On Schedule E they reported interests in the unrelated partnership, CNT, and CCFH. As noted above, both the unrelated partnership and CNT reported no gross receipts for 1999. Ms. Craig's 2.7744% share of CCFH's 1999 gross receipts was $51,080.70. Hence, Ms. Craig reported a total of $163,218.70 of business gross income.

For purposes of applying section 6501(e)(1)(A), Ms. Craig's 1999 stated gross income equals the sum of her nonbusiness income and her share of her business activities' gross receipts—that is, $215,849.70, 25% of which is $53,962.43; $17,292.39 does not exceed that amount. Hence, Ms. Craig's omission did not exceed 25% of her stated gross income.

In sum, for Mr. and Mrs. Carroll, the omitted amount exceeded 25% of reported gross income for tax year 1999; for Ms. Cadman and Ms. Craig, it did not. Accordingly, *Home Concrete* prohibits application of the six-year statute of limitations in section 6501(e)(1)(A) to Ms. Cadman and Ms. Craig, but not to Mr. and Mrs. Carroll. Because the limitations period remained open as to at least one of CNT's partners, its expiration as to two of the other partners did not render the FPAA meaningless. *See Rhone-Poulenc Surfactants & Specialties, L.P. v. Commissioner*, 114 T.C. at 534–535.

F. *Adequacy of Disclosure*

Finally, petitioner contends that the six-year limitations period cannot apply because the allegedly omitted item was adequately disclosed in the relevant returns.

1. *Legal Standard*

Section 6501(e)(1)(A)(ii) provides that "[i]n determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of

such item." In short, adequate disclosure in the return will insulate a taxpayer from application of the six-year limitations period of section 6501(e)(1)(A). For purposes of section 6501(e), the "return" in question consists of a taxpayer's own return, and if the taxpayer is a partner in a partnership or a shareholder in an S corporation, the partnership or S corporation's information return as well. *See Harlan v. Commissioner*, 116 T.C. 31, 53 (2001).

In evaluating an alleged disclosure, we ask whether a reasonable person would discern the fact of the omitted gross income from the face of the return. *Univ. Country Club, Inc. v. Commissioner*, 64 T.C. 460, 471 (1975). Whether a return adequately discloses omitted income is a question of fact. *Rutland v. Commissioner*, 89 T.C. 1137, 1152 (1987). In addressing that question, we bear in mind that in enacting the predecessor statute of section 6501(e)(1)(A)(ii), "Congress manifested no broader purpose than to give the Commissioner * * * [additional time] to investigate tax returns in cases where, because of a taxpayer's omission to report some taxable item, the Commissioner is at a special disadvantage in detecting errors. In such instances the return on its face provides no clue to the existence of the omitted item." *Colony, Inc. v. Commissioner*, 357 U.S. at 36.

Given this relatively narrow congressional purpose, we have held that for an alleged disclosure to qualify as adequate, the return need not recite every underlying fact but must provide a clue more substantial than one that would intrigue the likes of Sherlock Holmes. *See Highwood Partners v. Commissioner*, 133 T.C. 1, 21 (2009) (citing *Quick Trust v. Commissioner*, 54 T.C. 1336, 1347 (1970), *aff'd*, 444 F.2d 90 (8th Cir. 1971)). A disclosure need only be "sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the decision as to whether to select the return for audit may be a reasonably informed one." *Estate of Fry v. Commissioner*, 88 T.C. 1020, 1023 (1987). We have also cautioned, however, that an alleged disclosure will not qualify as adequate if the Commissioner must thoroughly scrutinize the return to ascertain whether gross income was omitted, *Highwood Partners v. Commissioner*, 133 T.C. at 22, or the disclosure is misleading, *Estate of Fry v. Commissioner*, 88 T.C. at 1023.

### 2. *Petitioner's Proof*

To demonstrate adequate disclosure, petitioner invites the Court's attention to various aspects of CCFH's, CNT's, and the individuals' 1999 tax returns. First, petitioner points to the December 1 return as disclosing CNT's formation and the contributions of the short sale proceeds and positions and the real estate. Second, he contends that the December 1 return also disclosed the short positions' closure. Third, petitioner cites the 351 statement as disclosing the Carrolls' contribution of their interests in CNT to CCFH. And fourth, he asserts that the December 31 return disclosed CCFH's distribution of CNT to its shareholders because it did not identify CCFH as a partner. In rebuttal, respondent narrows the aperture to CCFH's 1999 return, arguing that the Schedules K–1 do not reflect the appreciated real estate's distribution in any manner and that the 351 statement provides no clue as to the omitted income.

Petitioner frames the inquiry as whether the transaction was adequately disclosed, but to find that the Carrolls qualify for the statutory safe harbor, we need not conclude that the returns reasonably disclose each transactional step that they undertook. Rather, the statute requires disclosure "of the nature and amount" of the omitted item. *See* sec. 6501(e)(1)(A)(ii). This distinction matters. We conclude below that the returns adequately disclose the Carrolls' transactions—specifically, that CCFH distributed the real estate to its shareholders. But the returns do not reveal the one additional fact they must disclose for CNT's partners to qualify for the safe harbor: that the real estate's fair market value exceeded its adjusted basis, such that CCFH, and hence its shareholders, should have recognized some amount of gain in connection with the distribution—in short, that the real estate had appreciated.

### 3. *Returns' Revelations*

CCFH's 1999 return lies at the heart of our inquiry, and we begin there. Schedule L, Balance Sheet per Books, reflects that when 1999 began, CCFH owned land, buildings and other depreciable assets with a combined depreciated book value of $735,765. Schedule L further reflects that, at year-end, CCFH held buildings and other depreciable assets with

a combined, depreciated book value of $99,853, but no land. Plainly, CCFH engaged in a transaction involving its real estate at some point during the year.

CCFH's return does not readily disclose the form or nature of that transaction. As is most relevant here, the 1999 instructions to Schedule D (Form 1120S), Capital Gains and Losses and Built-In Gains, directed S corporations to use this schedule to report, inter alia, "[g]ains on distributions to shareholders of appreciated capital assets." Yet for 1999 CCFH did not file Schedule D. Moreover, although the 1999 instructions to Form 1120S directed that "[n]oncash distributions of appreciated property * * * valued at fair market value" be reported on line 20 of Schedule K, Shareholders' Shares of Income, Credits, Deductions, etc., CCFH reported on that line only $245,470—an amount less than the decrease in book value of CCFH's real estate and other depreciable assets, and far less than the distributed real estate's aggregate fair market value. Consequently, CCFH did not properly report the distribution, and it reported no other transaction that could account for the change in book value of its real estate and other depreciable assets. For example, CCFH did not file Form 4797, Sales of Business Property, on which it would have reported the sale or exchange of noncapital or business assets. Nor did it report having engaged in a like-kind exchange or other nontaxable transaction for which reporting is required.

Where, then, did the real estate go? CNT's December 1 return provides a plausible answer. That return reports that CCFH transferred $523,377 of property to CNT in exchange for a 15.4% interest in CNT, and that CNT terminated on December 1, 1999, after distributing $522,761, a near-equal amount of property, to CCFH. Looking again to CCFH's 1999 tax return, the attached 351 statement discloses that one or more existing CCFH shareholders transferred an 84.6% interest in CNT to CCFH on or after December 1, 1999. From these two returns one can reasonably discern that CNT's December 1 termination occurred pursuant to section 708(b)(1)(B); that CNT made only deemed, not actual, distributions to CCFH and its other interest holders; that CNT continued to hold the assets CCFH contributed to it; and that it became a disregarded entity wholly owned by CCFH when CCFH's shareholders contributed their CNT interests to

CCFH. All of the foregoing suggests that CCFH contributed the real estate to CNT, thereby converting its real estate assets to a non-real-estate asset without a taxable event.

New CNT's December 31 return completes the picture. The December 1 return coupled with the 351 statement revealed that CCFH became CNT's sole owner on December 1, 1999. On the appended Schedules K–1, the December 31 return identifies as New CNT's partners the same individuals identified as CCFH's shareholders on the Schedules K–1 appended to CCFH's 1999 return. The individuals' percentage interests in the two entities are identical. These details indicate that CCFH must have distributed interests in CNT, and indirectly its former real estate holdings, to its shareholders on December 31, 1999. Hence, CCFH and CNT's returns, which constitute part of Mr. Carroll's return for present purposes, provided a sufficient clue that an S corporation had distributed real estate to its shareholders.

But one crucial piece of the puzzle remains missing. Section 311(b) requires that a corporation recognize gain on a distribution of *appreciated* property to its shareholders as if it had instead sold the property for fair market value; if the property has not appreciated, no gain is recognized. The parties have stipulated that the aggregate fair market value of the five mortuary properties as of December 1999 was $4,020,000. That number appears nowhere in the various tax returns. Indeed, the returns nowhere disclose a fair market value for the real estate that would enable a reasonable revenue agent to discern that the real estate had appreciated, such that section 311(b) gain should have been reported.

CCFH's return reports only the real estate's book value together with that of other depreciable assets, not its fair market value. Schedule L of CNT's December 1 return lists no book values for the assets purportedly contributed to CNT (which would include the short positions and offsetting obligations purportedly contributed by the Carrolls in addition to the real estate), or for any other assets. Schedule M–2, Analysis of Partners' Capital Accounts, identifies the contributed property's book value, which would ordinarily equal its fair market value on the date of contribution, *see* sec. 1.704–1(b)(2)(iv)(*d*)(*1*), Income Tax Regs., as $3,400,718. New CNT's December 31 return lists buildings and other depreciable assets (but no land) with a book value of

$3,350,000 and capital contributions with an equal book value.

The returns making up Mr. Carroll's return for section 6501(e)(1)(A)(ii) purposes contain no clue that the fair market value of the property CCFH distributed to its shareholders was $4,020,000, or in any event, some amount greater than its tax basis. The returns disclose no shred of information that would alert the occupant of 221B Baker Street, let alone a reasonable revenue agent, to the facts that—basis overstatement notwithstanding—CCFH had omitted section 311(b) gain from its return and its shareholders had omitted section 1366(a)(1) passthrough gain from theirs.

Our caselaw is consistent with this conclusion. In *Estate of Fry v. Commissioner*, 88 T.C. at 1023, for example, we found a corporation's disclosure on its tax return of a $150,000 payment to be inadequate for purposes of section 6501(e)(1)(A)(ii) because the return "failed to show that the transaction was a redemption; i.e., a payment to a shareholder or that the payment was in fact a transfer of real property valued at $150,000". The returns under scrutiny here present the converse problem: They disclose that a transfer of real property occurred, but not the real property's value.

In *Univ. Country Club, Inc. v. Commissioner*, 64 T.C. at 470, we found adequate disclosure where the taxpayer fully reported a transaction consistently with the taxpayer's desired tax characterization, but the Commissioner later recharacterized the transaction. Here, in contrast, the Carrolls and their business entities did not fully report their transactions consistently with their desired tax characterization because, as we have explained, their transactions as reported should have resulted in $623,284 of recognized gain. Finally, in *Quick Trust v. Commissioner*, 54 T.C. at 1347, the Commissioner determined additional gross receipts for a partnership and argued that a partner had omitted them from income. We found adequate disclosure of the omitted income in the partnership's reporting of distributions to the partner far greater than the amount reported on the partner's return. *Id.* Here, however, no amount reported on any of the various tax returns hints at the source of the omitted item, the discrepancy between the real estate's tax basis and its fair market value.

For the foregoing reasons, Mr. and Mrs. Carroll may not claim the safe harbor of section 6501(e)(1)(A)(ii).

### G. *Conclusion*

We hold that the period for assessment for the 1999 tax year had expired with respect to Ms. Cadman and Ms. Craig before respondent issued the FPAA. They are not parties to this proceeding and will not be affected or bound by any readjustments determined herein. *See* secs. 6226(c), (d)(1)(B), 6228(a)(4)(B). We further hold that the six-year limitations period of section 6501(e)(1)(A) applies to Mr. and Mrs. Carroll for the 1999 tax year, and that this limitations period remained open when respondent issued the FPAA.

### III. *Consequences of the Sham Stipulation*

Because petitioner's statute of limitations arguments obliged us to consider the merits of some of respondent's determinations in the FPAA, we need only briefly discuss the second issue before us, whether the adjustments in the FPAA should be sustained. Petitioner conceded respondent's sham entity theory for determining the adjustments in the FPAA. At trial the parties essentially ignored the merits issues, concentrating instead on the statute of limitations and penalties, but on brief, respondent asserts that petitioner should be deemed to have conceded all theories raised in the FPAA because respondent's determinations enjoy a presumption of correctness. Petitioner claims that his concession mooted respondent's other theories and rendered litigation of them unnecessary.

Petitioner's concession and our holdings herein more than suffice to sustain the FPAA adjustments, and we decline to analyze respondent's other theories unnecessarily. We conclude that the FPAA adjustments to CNT's December 1 return should be sustained considering the parties' stipulation that CNT was a sham and our conclusions above concerning the sham and step transaction doctrines' applicability. [46]

---

[46] In the FPAA respondent reduced to zero CNT's reported capital contributions, distributions, and outside partnership basis. We sustain these adjustments principally on the basis of the parties' stipulation that CNT

Continued

IV. *Liability for the Accuracy-Related Penalty*

In the FPAA respondent determined that all underpayments of tax resulting from his adjustments of CNT's partnership items were attributable, in the alternative, to (1) gross (or if not gross, substantial) valuation misstatement(s), (2) substantial understatements of income tax, or (3) negligence or disregard of rules and regulations. Hence, respondent determined that either a 40% penalty or a 20% penalty would apply to any underpayment. *See* sec. 6662(a), (b)(1)–(3), (c)–(e), (h).

The Commissioner bears the burden of production and "must come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty." Sec. 7491(c); *see Higbee v. Commissioner*, 116 T.C. 438, 446 (2001). Once the Commissioner has met his burden of production, the burden shifts to the taxpayer to prove an affirmative defense or that he or she is otherwise not liable

---

was a sham partnership. Because CNT was not, for tax purposes, a partnership, it could neither receive contributions nor make distributions for purposes of subch. K of the Code, and its partners' having outside bases greater than zero was a "legal impossibility". *See Woods*, 571 U.S. at ____, 134 S. Ct. at 565 n.2.

Respondent also disallowed CNT's reported $2,268 of short-term capital loss and $1,734 of interest expense, both of which were incurred in connection with the Son-of-BOSS transaction. We sustain these adjustments because the short sale transaction was structured to assure it would have few or no economic consequences. It was, as we concluded above, an economic sham, so its direct tax consequences—the short-term capital loss and the interest expense—are properly disregarded. Disallowance of deductions for these passthrough items would ordinarily affect the Carrolls' bottom-line income in two ways: (1) directly, through elimination of their distributive share of CNT's reported interest expense ($1,385) and short-term capital loss ($1,811), and (2) indirectly, through elimination of their distributive share of CCFH's distributive share of CNT's reported interest expense ($267) and short-term capital loss ($349). However, although CNT issued a Schedule K–1 to CCFH that reflected its distributive shares of these passthrough items, CCFH did not report the items on its 1999 return, and the Schedules K–1 CCFH issued to its shareholders reflect no interest expense or short-term capital loss. Because CCFH apparently did not reduce its income by the amount of its $616 passthrough loss from CNT attributable to the short-term capital loss and the interest expense, disallowance of these underlying tax items will have no indirect effect via CCFH on the Carrolls' income.

for the penalty. *Higbee v. Commissioner*, 116 T.C. at 446–447.

A. *Penalties' Applicability*

Section 6662(a) and (b)(3) provides for imposition of a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to a substantial valuation misstatement. For returns filed on or before August 16, 2006, as is relevant here, a substantial valuation misstatement occurs when "the value of any property (or the adjusted basis of any property) claimed on any return of tax imposed by chapter 1 is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)". Sec. 6662(e)(1)(A). Section 6662(h) increases this penalty to 40% if the value or adjusted basis claimed on the return is 400% or more of the actual value or adjusted basis. A regulation clarifies that when the actual value or basis is zero, any claimed value is considered 400% or more of the correct amount. Sec. 1.6662–5(g), Income Tax Regs. [47]

In the FPAA respondent adjusted to zero several items on CNT's December 1 return, including partnership outside basis. We have sustained those adjustments in their entirety. [48] Consequently, for each of these items, the reported value exceeded the correct value by 400% or more. Respondent has satisfied his burden of production with respect to the gross and substantial valuation misstatement penalties, and petitioner does not question respondent's computations. Because we find the 40% gross valuation misstatement penalty applicable to any underpayment resulting from respondent's adjustments, we need not address the substantial understatement and negligence pen-

---

[47] Petitioner objects to the application of this regulation as inconsistent with precedent of the Ninth Circuit, to which he maintains this case is appealable. As we have explained, however, the Supreme Court's decision in *Woods* abrogates that precedent.

[48] Because the parties have stipulated that CNT is a sham entity, we disregard even CCFH's purported contribution of the real estate to CNT, so the value of CCFH's capital contribution and its outside basis in its CNT interest are both properly zero. CCFH simply retained its original basis in the real estate until it distributed that real estate to its shareholders on December 31, 1999.

alties. *See* sec. 1.6662–2(c), Income Tax Regs. (explaining that if a portion of an underpayment of tax is attributable to more than one type of misconduct described in section 6662, the applicable penalty is the highest percentage penalty triggered by the relevant types of misconduct).

B. *Petitioner's Defense*

A section 6662 penalty will not apply to any portion of an underpayment resulting from positions taken on the taxpayer's return for which the taxpayer had reasonable cause and with respect to which the taxpayer acted in good faith. *See* sec. 6664(c). Petitioner claims reasonable cause and good faith on the basis of his reasonable reliance on the advice of Messrs. Myers and Crowley.

Partner-level defenses, including reasonable cause and good faith, may not be asserted in a partnership-level TEFRA proceeding such as this one. *See New Millennium Trading, LLC v. Commissioner*, 131 T.C. 275, 288–289 (2008) (upholding temporary regulation as "a valid interpretation of the statutory scheme"); sec. 301.6221–1T(d), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999). But when the reasonable cause defense rests on the partnership's actions, we may entertain the defense at the partnership level, "taking into account the state of mind of the general partner," *Superior Trading, LLC v. Commissioner*, 137 T.C. at 91 (citing *New Millennium Trading, LLC v. Commissioner*, 131 T.C. 275), in this case, Mr. Carroll. [49]

We determine "whether a taxpayer acted with reasonable cause and in good faith * * * on a case-by-case basis, taking into account all pertinent facts and circumstances", sec. 1.6664–4(b)(1), Income Tax Regs., including "[t]he taxpayer's mental and physical condition, as well as sophistication with respect to the tax laws, at the time the return was filed", *Kees v. Commissioner*, T.C. Memo. 1999–41, 77 T.C.M. (CCH) 1374, 1378 (1999); *accord Ruckman v. Commissioner*, T.C.

[49] Mr. Carroll did not testify at trial; Ms. Craig and Ms. Cadman did. We decline petitioner's implicit invitation, on brief, to consider the Carrolls' collective good faith and reliance in determining whether he has satisfied his burden of proof as to the sec. 6664(c) defense. We will instead give Ms. Cadman's and Ms. Craig's testimony its proper weight and consider it, along with other testimony and evidence in the record, to the extent it constitutes circumstantial evidence of Mr. Carroll's state of mind.

Memo. 1998–83, 75 T.C.M. (CCH) 1880, 1886 (1998); *Escrow Connection, Inc. v. Commissioner*, T.C. Memo. 1997–17, 73 T.C.M. (CCH) 1705, 1714 (1997). Reliance on professional advice will absolve the taxpayer if such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6664–4(b)(1), Income Tax Regs. In such a case "the taxpayer must prove by a preponderance of the evidence that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

We examine below whether petitioner's professed reliance upon Mr. Myers satisfied each of these three requirements. Petitioner also contends that he relied on Mr. Crowley's advice, but this claim plainly fails. Ms. Cadman, who joined Mr. Carroll at the various meetings described herein, credibly testified that she believed Mr. Crowley endorsed the transaction. But Mr. Crowley testified, and Ms. Cadman confirmed, that Mr. Crowley had openly acknowledged that he did not fully understand the transaction. Even if, contrary to his testimony, Mr. Crowley endorsed the transaction and did not just tepidly agree to "go along with" it, petitioner's reliance on that endorsement could not have been reasonable and in good faith given Mr. Crowley's admitted confusion. Whatever constitutes "sufficient expertise to justify reliance," *see id.*, we think the adviser must, at the very least, hold himself out as possessing sufficient expertise to understand the transaction at issue. Mr. Crowley made no such pretense here—quite the opposite, in fact—so to the extent Mr. Carroll relied on his advice, that reliance was unjustified and unreasonable.

### 1. *Sufficient Expertise?*

The sufficiency of Mr. Myers' expertise poses a more difficult question. Rather than set a specific standard, the regulations under section 6664(c) outline certain baseline competency requirements. First, rather than mandate that the adviser possess knowledge of relevant aspects of Federal tax law, the regulations stipulate only that "reliance may not be

reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked" such knowledge. Sec. 1.6664–4(c)(1), Income Tax Regs. Second, the adviser must base his or her advice on "all pertinent facts and circumstances and the law as it relates" to them. *Id.* subpara. (1)(i). Third, the adviser must not himself or herself "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer *or any other person.*" *Id.* subpara. (1)(ii) (emphasis added).

In applying these general guidelines, this Court has not articulated a uniform standard of competence that an adviser must satisfy but has instead demanded expertise commensurate with the factual circumstances of each case. *See, e.g.*, *106 Ltd. v. Commissioner*, 136 T.C. 67, 77 (2011) (the taxpayer's longtime attorney and accounting firm, who "would have appeared competent to a layman", and especially so to the taxpayer, had adequate expertise to advise on a Son-of-BOSS-type transaction), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012); *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 99 (an insurance agent who was not a tax professional lacked sufficient expertise to advise on tax implications of a complex, group whole/term-hybrid life insurance plan); *Thousand Oaks Residential Care Home I, Inc. v. Commissioner*, T.C. Memo. 2013–10, at *13, *41 (the taxpayers' longtime accountant, an enrolled agent with a master's degree in business administration, was a competent professional with sufficient expertise to advise on employment plan contributions); *Kirman v. Commissioner*, T.C. Memo. 2011–128, 101 T.C.M. (CCH) 1625, 1633 (2011) (taxpayer failed to establish that part-time tax return preparer who held an accounting degree was a competent professional with sufficient expertise to advise on business expense and charitable contribution deductions).

Under the circumstances of this case, we think that Mr. Myers possessed sufficient expertise to justify reliance by Mr. Carroll. As of 1999 Mr. Myers had practiced law for 30 years and had represented Mr. Carroll for almost 20 of them. Mr. Carroll had relied on Mr. Myers' advice in growing his business through acquisitions, properly maintaining his corporation, complying with regulations, managing his employees, and formulating his estate plan. Although Mr. Myers did not hold himself out as a tax specialist and tended to refer clients out for complicated tax matters, he had studied tax in

law school and prepared estate tax returns, and he had previously advised Mr. Carroll on general tax law principles. The record reflects that Mr. Myers was Mr. Carroll's go-to attorney and trusted counselor.

The record also reflects that Mr. Carroll, while a successful businessman, was not a financial sophisticate. Although Mr. Carroll did hold a post-high-school degree in mortuary science, he had obtained it approximately 50 years earlier, and the record does not reflect that he obtained any further education. To the extent that his mortuary science college curriculum incorporated any finance, tax, or economics material, that material would have been sorely out of date by 1999. Indeed, Mr. Myers credibly testified that Mr. Carroll understood only basic tax principles. According to Mr. Crowley, Mr. Carroll had never before invested in even garden-variety mutual funds or securities, let alone participated in a short sale transaction involving T-notes. When presented with the exotic financial engineering proposed by Mr. Hoffman, Mr. Carroll naturally relied on Mr. Myers, to whom he had turned in the past for all forms of legal advice, including with regard to more general tax matters.

Mr. Myers performed due diligence. After Mr. Hoffman pitched the Son-of-BOSS transaction to him, in an effort to better understand the proposal Mr. Myers held a conference call with Mr. Mayer. This conversation left Mr. Myers unsatisfied with his grasp of how the transaction would work, so he requested, and Mr. Mayer sent, a memorandum and an article from a tax publication describing and analyzing the transaction and citing various legal authorities. Mr. Myers reviewed Mr. Mayer's memorandum and consulted some of the legal authorities cited therein, albeit not in extreme detail. He also researched Jenkens & Gilchrist. During the implementation phase, he spoke by telephone with Mr. Mayer several times.

Mr. Myers believed that he had a good grasp of how the Son-of-BOSS transaction would work and of the legal theories behind it. Although Mr. Myers did not know all of the details of the transaction, the record does not indicate that he shared this fact with Mr. Carroll. Rather, Mr. Myers formed the opinion that the transaction was "legitimate [and] proper", and he did share this opinion with Mr. Carroll. He

advised Mr. Carroll that the transaction looked like a viable way to resolve CCFH's low basis dilemma.

We find that Mr. Carroll could justifiably rely upon that advice. To Mr. Carroll, a tax and financial layperson, Mr. Myers would have appeared ideal, not simply competent, to advise him on the feasibility and implications of the basis boost transaction. *See 106 Ltd. v. Commissioner*, 136 T.C. at 77.

Respondent offers two counterarguments. First, he emphasizes that Mr. Myers was not a "tax professional". What constitutes a "tax professional" is debatable. Mr. Myers, for example, did provide some general tax advice to clients and also prepared estate tax returns, although he did not prepare other income tax returns (most attorneys do not) or specialize in dispensing tax advice. More to the point, the regulations under section 6664(c) define "advice" as including, but not as consisting solely of, communications of a "professional tax advisor". Our caselaw has never restricted the reasonable reliance defense to advice from persons bearing this moniker or any other. That caselaw prompts us to examine the substance of Mr. Myers' expertise under the particular factual circumstances of this case, which we have done.

Second, respondent suggests that Mr. Myers unreasonably and impermissibly relied, himself, on representations of Mr. Mayer. The regulations prohibit such reliance on a third party, *see* sec. 1.6664–4(c)(1)(ii), Income Tax Regs., and where, as here, the third party is a promoter, reliance is doubly forbidden, *see Canal Corp. v. Commissioner*, 135 T.C. 199, 218 (2010) ("Courts have repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest."); *Swanson v. Commissioner*, T.C. Memo. 2009–31, 97 T.C.M. (CCH) 1127, 1129 (2009) (holding that relied-upon advice must "be from competent and independent parties, not from the promoters of the investment"). *But see Bruce v. Commissioner*, T.C. Memo. 2014–178, at *56 & n.30 (finding that where a taxpayer retained his "longtime tax adviser" to meet with tax shelter promoters and advise him on the proposed transaction, the taxpayer reasonably relied upon the adviser rather than the promoters). Where the record establishes that the adviser

himself relied solely upon the promoters' opinions, the taxpayer's reliance might not be reasonable.

We acknowledge this issue is a close one. Mr. Myers did testify to having repeated conversations with Mr. Mayer in an effort to clarify his understanding of the proposed transaction. Yet taken as a whole, his testimony confirms that he did not rely on Mr. Mayer with respect to the facts or the law in forming his opinion in favor of the transaction. With regard to the facts, unlike Mr. Mayer, Mr. Myers possessed intimate knowledge of Mr. Carroll's personal and business legal arrangements, and his advice could thus take into account "all pertinent facts and circumstances" including "the taxpayer's purposes * * * for entering into a transaction and for structuring a transaction in a particular manner." Sec. 1.6664–4(c)(1)(i), Income Tax Regs. With regard to the law, Mr. Myers credibly testified that he directly reviewed some of the legal authorities cited in Mr. Mayer's memorandum and, crucially, that he believed he understood the legal theories behind the proposed transaction. Taking into account the entire record, we find that Mr. Myers did not simply rely upon assurances and representations by Mr. Mayer as to the transaction's tax implications but instead evaluated it for himself and formed an independent opinion.

Mr. Myers possessed sufficient expertise to justify reliance by a reasonable person of Mr. Carroll's education, sophistication, and business experience. Accordingly, *Neonatology*'s first prong is satisfied.

### 2. *Necessary Information?*

A taxpayer must affirmatively provide "necessary and accurate information to the adviser" on whose advice the taxpayer claims reliance. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 99. The regulations under section 6664(c) similarly caution that the taxpayer must not "fail[ ] to disclose a fact that it knows, or reasonably should know, to be relevant to the proper tax treatment of an item." Sec. 1.6664–4(c)(1)(i), Income Tax Regs. At the same time, however, those regulations provide that the reasonableness of a taxpayer's reliance must be determined "on a case-by-case basis, taking into account all pertinent facts and circumstances", including personal characteristics of the taxpayer. *Id.* para. (b)(1); *see also id.* para. (c)(1). The two fore-

going regulatory provisions, considered together, capture what should be an obvious corollary to *Neonatology*'s second prong: The taxpayer's obligation to provide the adviser with accurate information necessary to a competent analysis is coextensive with the taxpayer's knowledge. Stated differently, the taxpayer is not obliged to share details that the reasonably prudent taxpayer does not know, or that the taxpayer neither knows nor reasonably should know are relevant.

The parties dispute whether Mr. Carroll provided Mr. Myers with the information necessary for Mr. Myers to properly evaluate the proposed transaction. Respondent specifically points to two omitted nuggets of information: (1) the amount of Jenkens & Gilchrist's fee and (2) the fact that the short sale would almost certainly generate no profit. With regard to the short sale's profit potential, the evidence in the record makes clear that T-note short sales would have been wholly unfamiliar to Mr. Carroll, and we are not convinced that he understood the concept well enough to appreciate whether it was likely to yield a profit. With regard to Jenkens & Gilchrist's fee, the amount of that fee appears in the record only on an invoice dated March 23, 2000, months after the transactions at issue had concluded.

While we think it likely that Mr. Carroll, an astute businessman, would have inquired about price before plunging ahead, the record is silent as to when and under what circumstances that price was disclosed to him. There is no evidence that the fee was contingent or computed as a percentage of any alleged tax savings. Considering Mr. Carroll's education, experience, and sophistication, we find that he would not have recognized the fee amount's relevance to Mr. Myers' evaluation of the proposed transaction. Indeed, Mr. Myers testified that he did not find the fee amount unusual and that it would not necessarily have changed his assessment.

Respondent argues that Mr. Carroll's ability to profit from the Son-of-BOSS transaction, taking into account Jenkens & Gilchrist's fee, provided the transaction's only ostensible nontax substance. That may well be true, but as we have observed, Mr. Carroll had no prior experience with or knowledge of short sale transactions or margin trading and lacked an appreciation for the Son-of-BOSS transaction's profit

potential. He had been told—by Mr. Hoffman, to whom he had been introduced by his trusted counselor, Mr. Myers— that Ted Turner had prevailed in a legal case involving essentially the same transaction. Under the circumstances, a layperson like Mr. Carroll could reasonably have believed that his transaction would follow the Ted Turner model and that it, too, would pass muster; he could not reasonably have contemplated that the fees paid to a service provider to implement that model would make or break the transaction.

In sum, we conclude that Mr. Carroll has satisfied his burden of proof as to *Neonatology*'s second prong. While respondent has identified two items of information that Mr. Carroll failed to provide Mr. Myers, we decline to hold Mr. Carroll to an unreasonable standard exceeding his knowledge and capabilities. *See* sec. 1.6664–4(b)(1), (c)(1), Income Tax Regs.

### 3. *Good-Faith Reliance?*

As a further prerequisite to a reasonable reliance defense, a taxpayer must have actually received advice and relied upon it in good faith. *See Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. at 99. Advice need not "be in any particular form" but rather embraces "any communication * * * setting forth the analysis or conclusion of a person, other than the taxpayer, provided to * * * the taxpayer and on which the taxpayer relies, directly or indirectly". Sec. 1.6664–4(c)(2), Income Tax Regs. Mr. Myers credibly testified that he advised Mr. Carroll that the series of proposed transactions, including the Son-of-BOSS, looked like a viable way to resolve CCFH's low basis dilemma and that he believed it would be "legitimate [and] proper". We find equally credible Mr. Carroll's reliance upon that advice given Mr. Myers' longstanding role as Mr. Carroll's principal adviser in both business and personal legal matters.

Respondent, however, contends that any reliance by Mr. Carroll on Mr. Myers' advice could not have been in good faith because: (1) given his business savvy and intelligence, Mr. Carroll should have recognized the proposed solution to his low basis dilemma was too good to be true; (2) Mr. Carroll ignored warnings from the IRS about engaging in a Son-of-BOSS transaction; (3) Mr. Carroll's sole purpose for engaging in the transaction was to avoid Federal income tax;

and (4) Mr. Carroll failed to attempt to personally determine the Son-of-BOSS transaction's validity and the related tax returns' accuracy.[50] We consider each argument in turn.

First, respondent asserts that Mr. Carroll was highly intelligent, had no trouble understanding tax concepts, and understood, at the very least, the tax implications of transferring the real estate out of CCFH. In short, respondent argues, Mr. Carroll was smart enough to know that the result Messrs. Hoffman and Mayer pitched to him was too good to be true. For mental health reasons, Mr. Carroll, now in his mideighties, did not testify or even appear at trial, so the Court had no opportunity to observe him firsthand or to assess his credibility. Instead, we must weigh the other witnesses' expressed opinions of him and the factual information they provided about his education and experience.

The parties point to snippets of testimony by Messrs. Myers and Crowley in which they opine, mostly in response to leading questions, concerning Mr. Carroll's abilities. From their testimony as a whole, we conclude that, while Mr. Carroll's confidants respected his success as a businessman and believed him fairly intelligent, they also considered his knowledge of tax and financial matters rudimentary. Moreover, although the subjective opinions of trusted advisers are not unpersuasive, objective facts carry more weight. Mr. Carroll attended college, presumably on the "G.I. Bill" after World War II, but the college was a specialized one for morticians. He built a local chain of funeral homes from the ground up, but that business accounted for nearly 100% of his net worth. He made no diversifying investments and held his savings principally in cash. His business, operating funeral homes, demanded hard work, compassion, and some degree of numeracy; it did not require him to engage in complex problem-solving, legal research, or sophisticated financial transactions. On the record before us, we decline to find that Mr. Carroll knew or should have known that the promised results of the Son-of-BOSS transaction were too good to

---

[50] Respondent also argues that petitioner lacked good faith because he participated in a tax shelter, but the substance of this argument, including the authorities cited to support it, relates only to the substantial authority defense described in sec. 6662(d)(2)(B). Petitioner has not raised this defense, so we need not analyze respondent's argument against it.

be true.[51] *Cf. Rawls Trading, L.P. v. Commissioner*, T.C. Memo. 2012–340, at \*38–\*39 (holding that an "accomplished engineer" who "ha[d] cofounded a very successful fiber optics company" but was "not a sophisticated investor" or "familiar with tax law * * * did not have the background or experience necessary" to recognize that Son-of-BOSS transactions were "too good to be true").

Second, citing Rev. Rul. 95–26, 1995–1 C.B. 131, and Notice 2000–44, 2000–2 C.B. 255, respondent contends that Mr. Carroll ignored warnings from the IRS about engaging in a Son-of-BOSS transaction and therefore lacked good faith. Whether a taxpayer's reliance is reasonable under *Neonatology*'s first prong is an objective inquiry, but whether the taxpayer acted in good faith is a subjective one. Jenkens & Gilchrist's opinion letter discusses Rev. Rul. 95–26, *supra*, so we presume that Mr. Carroll was aware of it. Yet a revenue ruling reflects the IRS' position on an issue; it is not binding precedent. *E.g.*, *Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 209 n.16 (2009), *aff'd*, 679 F.3d 1109 (9th Cir. 2012); *Hosp. Corp. of Am. v. Commissioner*, 109 T.C. 21, 65 n.47 (1997). And Jenkens & Gilchrist's opinion letter also describes a host of contrary authorities and concludes that these precedents would govern if the IRS were to challenge the transaction. We accordingly cannot conclude that Mr. Carroll's presumed knowledge of Rev. Rul. 95–26, *supra*, negates his good faith.

With regard to Notice 2000–44, *supra*, we have no reason to suspect that Mr. Carroll was aware of the notice, and we will not impute to a taxpayer claiming reliance on a professional adviser knowledge of all policy statements published by the IRS to date. *See, e.g.*, *Am. Boat Co., LLC v. United*

---

[51] Respondent cites Mr. Crowley's alleged refusal to endorse the proposed transaction and the amount of Jenkens & Gilchrist's fee as "red flags" to which Mr. Carroll was willfully blind. First, the record reflects that Mr. Crowley acquiesced in the transaction, not that he affirmatively refused to endorse it. And second, respondent's comparison of the fee to the "millions of dollars in tax liabilities" avoided is hyperbole. The roughly $3.5 million of sec. 311(b) gain that went unreported could not, mathematically, generate multiple millions of dollars in tax liability at the individual tax rates then in effect. Moreover, Mr. Myers, at least, did not consider the fee amount obviously excessive given Jenkens & Gilchrist's size, stature, and metropolitan base.

*States*, 583 F.3d 471, 483–486 (7th Cir. 2009) (affirming District Court's holding that tax matters partner reasonably relied on Mr. Mayer with regard to a Son-of-BOSS transaction from which the partnership began claiming substantial tax benefits in 1999); *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F. Supp. 2d 885, 902, 904–905 (E.D. Tex. 2007) (holding that tax matters partner reasonably relied on professional advice with regard to a transaction covered by Notice 2000–44), *remanded on other grounds*, 568 F.3d 537 (5th Cir. 2009); *see also Sun Microsystems, Inc. v. Commissioner*, T.C. Memo. 1995–69, 69 T.C.M. (CCH) 1884, 1887 (1995) (notices, like revenue rulings, are mere statements of the IRS' position). Mr. Carroll, even if he knew about it, did not necessarily demonstrate a lack of good faith in failing to follow IRS administrative guidance.

Third, respondent insists that Mr. Carroll's sole purpose for engaging in the transaction was to avoid Federal income tax and that this fact belies his claim of good faith. As we have explained, however, Mr. Carroll had an independent, nontax purpose for engaging in the series of transactions that included the Son-of-BOSS: He sought to rearrange his assets in the manner his longtime advisers, Messrs. Myers and Crowley, deemed best to facilitate sale of the funeral home business and retirement income for the Carrolls. *Cf. Gerdau Macsteel, Inc. v. Commissioner*, 139 T.C. 67, 196 (2012) (finding that taxpayers could not have relied on a legal opinion in good faith when they "knew that the *only* purpose of the transactions was to achieve a tax loss" (emphasis added)).

Granted, he sought to do it in a manner that would minimize his tax liability, and he had in fact contemplated this rearrangement of assets for some time but postponed it because of the anticipated tax implications. His motives were thus mixed. *See Gregory v. Helvering*, 293 U.S. at 468–469 (explaining that a taxpayer's "motive * * * to escape payment of a tax" will not invalidate an otherwise lawful transaction but finding the instant transaction invalid because it lacked any nontax purpose). But that Mr. Carroll had two goals in mind does not imply that he did not rely in good faith upon Mr. Myers' advice that, after years of analyzing and rejecting various alternatives, a group of transactions had finally been conceived through which Mr. Carroll could

achieve his two historical objectives simultaneously. *See Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934) ("Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.").

Finally, respondent argues that Mr. Carroll's failure to attempt to personally determine the Son-of-BOSS transaction's validity and the related tax returns' accuracy demonstrates he lacked good faith. The regulations under section 6664(c) emphasize that "[g]enerally, the most important factor" in determining whether a taxpayer acted with reasonable cause and good faith "is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Sec. 1.6664–4(b)(1), Income Tax Regs. The regulations do not, however, require that the taxpayer *personally* analyze his or her liability. On the contrary, the regulations expressly permit a taxpayer to establish reasonable cause through reasonable reliance on professional advice. As the Supreme Court explained in *United States v. Boyle*, 469 U.S. 241, 251 (1985):

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * *

Nevertheless, we have stated that "blind reliance on a professional does not establish reasonable cause." *Estate of Goldman v. Commissioner*, T.C. Memo. 1996–29, 71 T.C.M. (CCH) 1896, 1903 (1996).[52] As respondent points out, Mr.

---

[52] Like the coexecutrices in *Estate of Goldman v. Commissioner*, T.C. Memo. 1996–29, 71 T.C.M. (CCH) 1896 (1996), when Mr. Crowley presented him with CNT's 1999 tax returns, Mr. Carroll asked no questions and, to Mr. Crowley's knowledge, did not review the returns before signing them. Yet in *Estate of Goldman*, the coexecutrices faced other obstacles to establishing good faith. One coexecutrix wrote 16 $10,000 checks from the hospitalized decedent's accounts, apparently to deplete them before her death, and claimed that the decedent intended to make gifts. *Id.*, 71 T.C.M. (CCH) at 1898, 1900. She also wrote $25,000 checks to herself and

Continued

Carroll asked no questions and has not established that he reviewed CNT's 1999 tax returns when Mr. Crowley presented them to him for signature; he simply signed them. Mr. Carroll's apparent possible failure to scrutinize CNT's returns is troubling, but not fatal. We cannot characterize his reliance on Mr. Crowley as "blind" given the depth and duration of their professional relationship. In any event, the fact that the reliance at issue here is Mr. Carroll's reliance on Mr. Myers makes respondent's argument regarding Mr. Carroll's failure to review the returns a red herring. The returns' inaccuracy stemmed not from a computational or other return preparation error by Mr. Crowley, but rather from Messrs. Mayer's, Hoffman's, and Myers' failure to appreciate that CNT was a sham partnership. Had Mr. Carroll reviewed the returns, he would have seen nothing inconsistent with the theories that Mr. Myers had assured him were sound.

We find that Mr. Carroll relied on Mr. Myers in good faith, thereby satisfying *Neonatology*'s third prong. Hence, he has demonstrated reasonable cause and good faith within the meaning of section 6664(c), and no penalty shall be imposed with respect to any portion of any underpayment resulting from the FPAA adjustments.

## V. *Conclusion*

We conclude that the period of assessment remained open as to Mr. and Mrs. Carroll's 1999 tax year when respondent issued the FPAA and that the FPAA was consequently timely as to them. We further conclude that neither Ms. Cadman nor Ms. Craig is a proper party to this action under section

---

her coexecutrix from the estate's accounts, purportedly for expense reimbursement; the estate could not substantiate any of the expenses, and neither executrix could recall whether she actually spent $25,000. *Id.* at 1902. *Bagur v. Commissioner*, 66 T.C. 817 (1976), *remanded on other grounds*, 603 F.2d 491 (5th Cir. 1979), and *Georgiou v. Commissioner*, T.C. Memo. 1995–546, 70 T.C.M. (CCH) 1341 (1995), on which *Estate of Goldman* relies, are likewise inapposite. In *Bagur v. Commissioner*, 66 T.C. at 823–824, the taxpayer did not rely on a professional but rather assumed, without ever discussing it with him, that her husband had filed joint returns and signed her name. In *Georgiou v. Commissioner*, 70 T.C.M. (CCH) at 1353, the record established that the taxpayers conspired with their tax return preparers to present false accounting information and instructed the preparers rather than relied on them.

6226(d)(1)(B). We sustain respondent's adjustments to CNT's partnership items determined in the FPAA and hold that while the gross valuation misstatement penalty would otherwise apply here, petitioner has demonstrated reasonable cause and good faith, so no penalty is applicable.

The Court has considered all of petitioner's and respondent's contentions, arguments, requests, and statements. To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

> *An appropriate order and decision will be entered.*